# EXHIBIT B

| | |
|---|---|
| **From:** | Robert Gilmore |
| **To:** | Joe Oliveri; Steven Harrison; Tom Clare |
| **Cc:** | Phil O"Beirne |
| **Subject:** | Complaint against Andre Pienaar |
| **Date:** | Thursday, September 11, 2025 6:28:57 PM |
| **Attachments:** | 2025.08.27 ECF 1 Complaint.pdf |

Counsel:

As you may know, we have filed the attached complaint against your client, Andre Pienaar, in the D.D.C. Because you represented Mr. Pienaar on the foreign discovery matter in the D.D.C., we are contacting you to ask if you are authorized to accept service of this complaint on his behalf. Please advise.

Best regards,

**Robert B. Gilmore**
**Stein Mitchell Beato & Missner LLP**
2000 K Street, NW, Suite 600
Washington, DC 20006
**D** 202.601.1589
**C** 202.352.1877
**F** 202.296.8312
rgilmore@steinmitchell.com
www.steinmitchell.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KENNETH GLUECK,
11730 Lake Shore Pl.
North Palm Beach, FL 33408

   *Plaintiff*,

  v.

ANDRE PIENAAR
765 Tropical Cir.
Sarasota, FL 34242

and

JULEANNA GLOVER,
2146 Wyoming Ave. NW
Washington, DC 20008

   *Defendants*.

Case No. 1:25-cv-2899

# COMPLAINT FOR DEFAMATION, FALSE LIGHT INVASION OF PRIVACY, AND CIVIL CONSPIRACY

i

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ............................................................................................ 1

JURISDICTION AND VENUE ..................................................................................... 7

PARTIES ...................................................................................................................... 7

   A.   Plaintiff Kenneth Glueck ................................................................................ 7

   B.   Defendant Andre Pienaar ................................................................................ 8

   C.   Defendant Juleanna Glover ............................................................................ 10

RELEVANT FACTS ..................................................................................................... 11

   A.   The Overlapping Commercial and Personal Relationships Between Pienaar,
       Donnelly, and Amazon ................................................................................... 13

   B.   Donnelly and the JEDI Cloud Acquisition .................................................... 14

   C.   Pienaar's Involvement in Donnelly's Supposed Divestment from Her Firm SBD
       Advisors .......................................................................................................... 16

   D.   The Preparation of the PowerPoint Presentation ........................................... 30

   E.   Pienaar's Failed Investment in IronNet, Fraud Litigation and Bankruptcy .......... 32

   F.   Pienaar and Glover Organized a Meeting With Journalists to Attack and Defame
       Glueck ............................................................................................................. 34

   G.   Pienaar Falsely Denied Having Facilitated Amazon's Black Letter Bribery
       Scheme ............................................................................................................ 39

   H.   The Assertion that Glueck Used Fraudulent Documents in the Slide Deck is False
       and Defamatory .............................................................................................. 44

   I.  The Assertion that Glueck Lied About Pienaar's Involvement in the Corrupt
     Transaction with Donnelly is False and Defamatory ....................................... 49

       1.   Amazon ................................................................................................ 50

       2.   Pienaar and C5 Capital ........................................................................ 50

       3.   SBD Advisors ...................................................................................... 51

   J.   The Entire Press Meeting was Revisionist, False and Defamatory ..................... 52

   K.   The Defamatory Press Conference (and the Broader Campaign) Had Its Desired
       Effect .............................................................................................................. 55

COUNT I ...................................................................................................................... 58

COUNT II ..................................................................................................................... 59

COUNT II ..................................................................................................................... 61

PRAYER FOR RELIEF ................................................................................................ 62

DEMAND FOR JURY TRIAL ..................................................................................... 62

Plaintiff Kenneth Glueck, through the undersigned counsel, brings this complaint for defamation, false light invasion of privacy, and civil conspiracy against Defendants Andre Pienaar and Juleanna Glover, seeking to recover actual and punitive damages, attorneys' fees and costs, and all other remedies under applicable law. Mr. Glueck alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is a suit to redress an unjust injury to the reputation of Plaintiff Kenneth Glueck, Executive Vice President for Government Relations at Oracle Corporation, one of the world's leading technology companies, where he has been employed for 29 years.

2.      Defendant Andre Pienaar – owner of purported investment firm C5 Capital – and Defendant Juleanna Glover – founder and CEO of Ridgely Walsh, a lobbying and public relations firm – conspired to defame Glueck by smearing his reputation and character repeatedly to influential journalists through false and malicious statements Defendants knew to be untrue.

3.      In October 2024, the Associated Press ("AP") published an article by investigative journalist Alan Suderman about the collapse of a company called IronNet, and the personal history of one of its largest investors, Andre Pienaar.

4.      The article, entitled "Collapse of National Security Elites Cyber Firm Leaves Bitter Wake," chronicles the story of a high-profile cyber-security startup that went public in 2021, reached a market valuation of $3 billion, and two years later was bankrupt, leaving investors, lenders, and employees in its wake.[1]

5.      The article is replete with candid assessments from former business associates of Pienaar, who went on the record about Pienaar's troubling involvement with IronNet. One analyst

---

[1] *See gen.* Suderman, Alan, "Collapse of national security elites' cyber firm leaves bitter wake," AP, Oct. 4, 2024, *available at* https://apnews.com/article/keith-alexander-ironnet-cybersecurity-nsa-bankruptcy-eddd67f3a1b312face21c29c59400e05 (last visited July 31, 2025).

said its collapse "ranks as one of the most high-profile flameouts in the history of cybersecurity."

6.      In February 2024, Pienaar's firm C5 Capital took IronNet private. IronNet's failure is of substantial interest to journalists and the public. Pienaar is a legitimate part of that story.

7.      Pienaar has crafted and curated an image as a statesman, cyber security expert, and philanthropist. In reality, he is a low-level private intelligence operative who has made a career trading on proximity to important people in industry and government, particularly in the national security space.

8.      In addition, however eager Pienaar is to deny it, he has had a long history with individuals of less than stellar character, including a Russian oligarch on the U.S. Treasury sanctions list.

9.      More than a year before the article's publication, Pienaar sued the AP's Suderman in what may be an unprecedented attempt to intimidate the press. Pienaar filed a $10 million defamation lawsuit against Suderman *personally* long before any article was published.

10.      This novel anticipatory defamation theory was premised on the notion that Suderman somehow defamed Pienaar when Suderman asked sources (for example) about allegations of "financial irregularities with how Andre operated C5 [Capital]."

11.      Upon information and belief, this lawsuit had the effect of forestalling the AP article for more than a year. During this time, Pienaar continued to raise and borrow money for IronNet from investors and lenders. Most of those funds are now gone.

12.      Once the article was published and Pienaar faced the prospect of pressing his defamation claims through discovery in that case – and himself testifying under oath – Pienaar suddenly dropped his claims against Suderman entirely.

13. At the time of the article, IronNet was in midst of Chapter 11 bankruptcy proceedings. The bankruptcy Trustee has since moved to convert it from Chapter 11 reorganization to a Chapter 7 liquidation.[2] Suderman's inquiries about "financial irregularities" at C5 Capital and IronNet, a firm once publicly traded at a multibillion-dollar valuation and now facing liquidation, seem to have been objectively proper.

14. Having abandoned an active defamation lawsuit that would have allowed him to vindicate himself on the merits, Pienaar chose a different strategy.

15. Pienaar hired public relations advisor Juleanna Glover.

16. In October 2024, Pienaar and Glover defamed Plaintiff Kenneth Glueck, at an hour-long private press conference at Glover's home in Washington, D.C. and at other one-on-one briefings with reporters. Glueck is not mentioned in the AP story, no doubt because he has nothing to do with – and no interest in – IronNet. Yet the entire October 2024 meeting with journalists consisted of a series of false and defamatory statements about Glueck.

17. This meeting was part of a broader campaign – pitching other journalists – planned and executed by Pienaar and Glover to redirect attention from Pienaar's own business failures by claiming that Pienaar's troubles were somehow of Glueck's making.

18. With knowledge that these statements were false (or with reckless disregard for their falsity) Pienaar and Glover claimed that the AP story was caused by Glueck who (they claimed) knowingly circulated fraudulent material to destroy Pienaar out of personal animus. They claimed that the AP article about Pienaar was improperly influenced by Glueck. They accused Glueck of 'spinning' up false narratives about people and shopping those narratives to the media

---

[2] *See gen. In re: IronNet Inc.*, Case No. 23-11710-BLS, United States Bankruptcy Court for the District of Delaware.

as part of Glueck's supposed efforts to "destroy people." Among a litany of other fantastical claims about Glueck, they accused him of using "fabricated" information to run a "clandestine campaign" against Pienaar and others. It didn't stop there.

19.     Upon information and belief, Defendants defamed Glueck in the hope that painting Pienaar as a victim of Glueck's misrepresentations – and creating news stories about the same – would insulate Pienaar from the increased scrutiny that he was receiving in 2024 around IronNet. By attempting to shift the focus to Glueck's supposed malign acts, Pienaar evidently thought he could continue to raise funds from investors to prop up what increasingly appears to be a Ponzi scheme built around C5 Capital and IronNet.

20.     Defendants' statements are defamatory, *per se*, and rightly expose them to actual and punitive damages in this case.

21.     Glueck's only knowledge of Pienaar and his affairs stems from an entirely different controversy – not involving IronNet – in which Pienaar was once again at the center.  In 2017, 2018, and 2022 Pienaar purchased a consulting firm, SBD Advisors LLC ("SBD" or "SBD Advisors"), which was founded by Washington lobbyist and insider Sally B. Donnelly.

22.     Donnelly was required to divest from her namesake firm, SBD Advisors, when she accepted a senior position at the Department of Defense ("DoD") in January 2017. Donnelly's firm at the time was lobbying on behalf of Amazon, which sought to receive DoD cloud technology contracts.

23.     Upon joining DoD, Donnelly positioned herself with substantial influence over the planning and orchestration of the much-maligned – and ultimately abandoned – Joint Enterprise Defense Initiative ("JEDI") cloud procurement. Throughout the JEDI process she aggressively and improperly advocated for her former firm's client, Amazon, to receive the sole-source contract.

24.     Donnelly's supposed divestment from her firm was facilitated through an opaque web of related-party transactions with Pienaar at the center.

25.     Pienaar's firm, C5 Capital, was at the time an Amazon commercial partner. Pienaar was also in a romantic relationship with (and later married) Amazon's senior government cloud sales executive, directly responsible for the DoD JEDI procurement.

26.     Glueck compiled information from public records, documents produced from Freedom of Information Act ("FOIA") requests and information from whistleblowers who had percipient knowledge of the facts. He assembled that evidence in detailed PowerPoint presentations. These presentations documented Pienaar and Donnelly's financial and commercial ties to Amazon, Donnelly's conflicted official acts at DoD, and the opaque nature of Pienaar's pivotal role in Donnelly's divestiture. Glueck presented his findings to various government oversight bodies and law enforcement.

27.     It is one of Glueck's fact-based PowerPoint presentations – to which Pienaar and Glover have misleadingly applied the sinister label "dossier" – that Pienaar and Glover attacked at their October 30, 2024 meeting and thereby defamed Glueck. Underscoring her commitment to their defamatory assertions, Glover declared: "sorry guys, I get really jacked about this."

28.     Defendants accused Glueck of running "a clandestine campaign" against Pienaar and others.

29.     Glueck stands by every assertion he has ever made regarding the JEDI controversy, including every word of the PowerPoint presentation, as a rigorously sourced, truthful, and good faith effort to present a catalog of government corruption involving Donnelly, Pienaar, and Amazon, all of whom used illicit measures and influence in their efforts to secure a $10 billion, 10-year monopoly on DoD cloud computing.

30.    The PowerPoint presentation was prepared and delivered years before Pienaar's 2024 press conference and never once mentions IronNet. Glueck is irrelevant to the AP story published years later.

31.    Yet Pienaar was so desperate to distract from the spectacular collapse of IronNet and the understandable scrutiny of his conduct, that he and Glover turned their fire on Glueck. They did not sue Glueck (as Pienaar did Suderman) for allegedly distributing false or fabricated documents harmful to Pienaar. Instead, they smeared him to assembled journalists as a liar, who uses manufactured evidence to hurt people out of personal animus.

32.    As described in detail herein, Defendants falsely told the journalists at their October 2024 meeting that Glueck:

- used fraudulent documents;

- lied about Pienaar's involvement with a Russian oligarch;

- improperly induced an AP article;

- lied about Pienaar's involvement in the SBD transaction involving Donnelly; and

- made these lies as part of Glueck's *modus operandi* to present false narratives about his enemies to destroy them for personal animus.

33.    Upon information and belief, their purpose was to discredit the AP story and paint Pienaar as a victim of Glueck so Pienaar could resuscitate his damaged reputation and continue to raise money for his own investments.

34.    Glueck therefore brings this suit to hold Pienaar and Glover accountable for their lies about his character and conduct, and to recover actual and punitive damages and all other appropriate relief for the harm they have caused.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction by virtue of diversity of citizenship, pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00) and there is complete diversity among the parties.

36.     This Court has personal jurisdiction over Defendant Pienaar pursuant to § 13-423 of the District of Columbia Code by virtue of his (i) regularly and frequently transacting business in the District of Columbia, (ii) arranging and attending the October 30, 2024 meeting at Glover's house in the District of Columbia at which Defendants made the defamatory statements to the assembled journalists, (iii) causing wrongful injury to Glueck in the District of Columbia by acts committed in the District, and (iv) upon information and belief, having an interest in, using, or possessing real property within the District of Columbia.

37.     This Court has personal jurisdiction over Defendant Glover pursuant to § 13-422 of the District of Columbia Code because she is a domiciliary of the District of Columbia.

38.     Venue is proper in this Court because a substantial part of the events giving rise to the claims – namely, the October 30, 2024 press meeting at which Defendants made their defamatory statements – occurred in the District, and because all Defendants are subject to personal jurisdiction in this District.

## PARTIES

### A.  Plaintiff Kenneth Glueck

39.     Glueck is Executive Vice President for Government Relations at Oracle Corporation ("Oracle"), one of the world's leading technology companies, where he has worked for almost 30 years.

40.     Over those three decades, Glueck has built a reputation for honesty and integrity.

While proudly serving as a tireless advocate for the interests of Oracle, its customers, employees, and shareholders, he has performed his duties in accordance with the highest ethical standards. Oracle's Code of Conduct requires such a commitment and Glueck has happily supplied it.

41.    Glueck oversees Oracle's global government affairs, public relations and corporate communications teams. His ability to do his job depends on the good name he has cultivated for decades as an honest broker.

42.    Glueck has numerous, deep relationships with key current and former government officials, journalists, and thought leaders in Washington and around the world.

43.    Glueck has a reputation for honesty, credibility, and capability. Glueck's reputation is vital for his ability to advocate effectively and persuasively for Oracle's interests.

44.    Thus, the sort of defamatory accusations that Defendants have leveled against him—accusations made to established journalists at some of the foremost news outlets in the country—harm his reputation, relationships, and livelihood.

45.    Glueck is a resident of Florida and is domiciled there.

**B.  Defendant Andre Pienaar**

46.    Upon information and belief, Pienaar is not a U.S. citizen, and he has not been lawfully admitted for permanent residence in the United States.

47.    Pienaar has asserted (in court filings in another matter) that he is a "U.K. citizen, domiciliary, and resident," although he was born in South Africa and spent much of his life there.

48.    Depending on the public document, Pienaar also claims to be a resident of the "British Indian Ocean Territory." The British Indian Ocean Territory (consisting primarily of the island Diego Garcia) is a joint U.S. – U.K. military base and was reported by U.S. State Department

officials to have been a black site for the detention and interrogation of CIA detainees.[3]

49.     Upon information and belief, however, Pienaar often resides with his wife Teresa Carlson, a former executive at Amazon, either in D.C. or Florida.

50.     Pienaar began his career at Kroll, Inc., a private investigative and corporate intelligence firm. He then founded Good Governance Group Limited ("G3"), which likewise was a private investigative and corporate intelligence firm.

51.     Pienaar is Founder and (presently) CEO of C5 Capital ("C5"), which he started between 2009 and 2014. According to its website, C5 is a "venture capital and private equity firm specializing in investments within the cybersecurity, cloud infrastructure, and clean energy sectors."

52.     C5 is an opaque, impenetrable set of dozens of intertwined nested entities registered in Luxembourg, the United Kingdom, and the U.S. Initially structured as a foreign entity (operating in the UK first with a holding company in the Isle of Man and then in Luxembourg), the majority of its financial statements have been filed in Luxembourg and are mind-numbingly complex for what amounts to a simple venture capital firm.

53.     This is not the first lawsuit brought against Pienaar and/or his C5 entities. He has been sued by the U. S. Institute for Peace[4] and an order of Catholic nuns.[5]  In the former, Pienaar was sued to enforce charitable commitments. The latter suit addressed C5's handling of millions of dollars invested by the nuns in Pienaar's businesses.

---

[3] https://www.theguardian.com/world/2015/jan/30/cia-interrogation-diego-garcia-lawrencewilkerson.
[4] *See gen. Peacetech Labs vs. Andre Pienaar, et al.*, Case No. 1:20-cv-00922-JDB, United States District Court for the District of Columbia.
[5] *See gen. The Medaille Corporation vs. C5 Accelerate LLC, et al.*, Case No. 22002731, Circuit Court of Arlington County, Virginia.

54.     Just a couple of years ago, IronNet – Pienaar's most significant investment – imploded spectacularly. The former high-flying cybersecurity firm filed for bankruptcy and faced a securities fraud class action, which later settled for $6.6 million. Recently, the U.S. Bankruptcy Trustee petitioned to convert IronNet from a Chapter 11 reorganization to a Chapter 7 liquidation.

55.     In addition, Pienaar and/or C5 are currently defendants in two additional cases being litigated in the District over further unmet obligations.[6,7] Indeed, the list of aggrieved charities, business partners, investors, employees, and vendors that Pienaar has left in his wake is long and growing.

56.     Pienaar frequently conducts business and personal matters in Washington, D.C. His wife owns a condominium in the District and a house in Virginia, and recently, C5 relocated its headquarters from London to Washington, D.C.

**C.  Defendant Juleanna Glover**

57.     Glover is the founder and CEO of the D.C.-based public relations firm, Ridgely Walsh, LLC. She is a resident of and domiciled in Washington, D.C.

58.     According to her biography on the Ridgely Walsh website, she advises clients on high stakes public affairs strategies.

59.     Upon information and belief, Pienaar hired Glover to aid him in convincing journalists that Glueck had manufactured a slide deck using fraudulent documents, and that its assertions concerning Pienaar were false.

---

[6] *See gen. Steve Baldwin, et al. vs. Andre Penaar [sic], et al., Case No. 2025-CAB-000693,* Superior Court of the District of Columbia
[7] *See gen. Hill East Group, LLC vs. C5 Capital USA LLC,* Case No. 2025-CAB-003862, Superior Court of the District of Columbia

## RELEVANT FACTS

60.     Glueck only finds himself in Pienaar's crosshairs because of Glueck's efforts to report a corrupt influence peddling scheme at the Department of Defense related to the $10 billion, 10-year sole-source JEDI cloud procurement. Amazon was the intended recipient of the sole-source contract.

61.     Prior to joining the Pentagon in January 2017, Donnelly and her business partner from SBD Advisors, Anthony DeMartino, were Amazon lobbyists. Amazon was widely believed to be the sole recipient of the eventual JEDI contract.

62.     On September 13, 2017, the Deputy Secretary of Defense issued a memorandum directing the Department to procure enterprise-wide cloud services. Donnelly and DeMartino were intimately involved in the initiative and assisted directly in the memo's preparation.

63.     The JEDI contracting officer testified that the "Secretary wanted it done," and that "nobody had planned for this memo to come out." The Air Force justified a sole-source cloud contract for Amazon stating, "the [Amazon Web Services] Cloud Solution is a DoD priority as per the Secretary of Defense Memorandum dated 13 Sep 2017."

64.      Upon information and belief, no one in the Pentagon misunderstood the meaning or the import of this memorandum. On December 3, 2017, Pentagon Acquisition Chief Ellen Lord said, "We are, no kidding, right now writing the contract to get everything moved to one cloud to begin with and then go from there."[8]  It was an open secret that there was never going to be a competitive JEDI procurement; the memo said as much. Aided by a small, influential group within the Pentagon, including Donnelly, the fix for Amazon was in.

---

[8] *See gen*. Wakeman, Nick, "DOD's massive cloud solution remains fluid," Washington Technology, Dec. 21, 2017, *available at* https://www.washingtontechnology.com/2017/12/dods-massive-cloud-solution-remains-fluid/357773/ (last visited July 31, 2025).

65.     Even years later, in October 2022, Amazon CEO Jeff Bezos was asked about JEDI under oath in an entirely different proceeding before the Federal Trade Commission ("FTC"). The FTC attorney, as part of their questioning, asked Bezos, "What does JEDI refer to here?" Bezos responded, "JEDI is the AWS [Amazon Web Services] DoD contract." Apparently, the fact that JEDI was preordained for Amazon was not lost on Bezos either. Remarkably Freudian because JEDI was not an Amazon cloud "contract," it was a cloud procurement for which Amazon was supposedly only one of many competitors.

66.     Despite Amazon's efforts to clear a smooth path for the contract, over the course of the next three years, JEDI was mired in controversy. In October 2019, following delays and high-profile disputes, JEDI was awarded to Microsoft.[9] Amazon challenged that award in Court and lost. The JEDI procurement was ultimately cancelled in July 2021.[10]

67.     Upon information and belief, the JEDI controversy stemmed from its origins among a small group of conflicted policy advisors playing an inside game with Amazon at the center. This group took actions to forge an ill-conceived, unimpeded route for Amazon to secure the single contract for the Pentagon's enormous, heterogeneous computing requirements.

68.     Today, the Pentagon, as well as the U.S. intelligence community, have adopted multi-cloud computing frameworks and abandoned soul-source ideas like JEDI. In November 2020, the U.S. Intelligence Community awarded its Commercial Cloud Enterprise ("C2E") to

---

[9] See gen. Conger, Kate, et al., "Microsoft Wins Pentagon's $10 Billion JEDI Contract, Thwarting Amazon," Oct. 25, 2019, available at https://www.nytimes.com/2019/10/25/technology/dod-jedi-contract.html (last visited July 31, 2025).

[10] See gen. Conger, Kate and Sanger, David, "Pentagon Cancels a Disputed $10 Billion Technology Contract," July 6, 2021, available at https://www.nytimes.com/2021/07/06/technology/JEDI-contract-cancelled.html (last visited July 31, 2025).

Google, Microsoft, Amazon, Oracle, and IBM.[11] In December 2022, DoD announced the Joint Warfighter Cloud Capability ("JWCC"), the JEDI replacement. JWCC was a multi-cloud award for cloud computing from Google, Microsoft, Amazon, and Oracle.[12]

### A. The Overlapping Commercial and Personal Relationships Between Pienaar, Donnelly, and Amazon

69.     As stated above, Donnelly consulted for Amazon and advocated on its behalf through her D.C.-based consulting firm, SBD Advisors.  She did this work prior to joining the DoD in January 2017 as a senior advisor in the Office of the Secretary of Defense.

70.     While at SBD, Donnelly's client at Amazon was Teresa Carlson, Vice President of Sales for Public Sector, including the U.S. Department of Defense.

71.     Pienaar's firm, C5, was a commercial partner of Amazon during the relevant time.

72.     C5 was also a paying client of SBD during the relevant time.

73.     Pienaar purchased Donnelly's firm, SBD Advisors, through at least *four* separate, opaque transactions.  SBD is now believed to be entirely owned by Pienaar and C5.

74.     Between 2013 and 2014, Pienaar made "angel" investments in Donnelly's firm totaling $680,000, which was followed by a $390,000 investment in August 2016.

75.     In 2022, Pienaar told Congressional investigators that he acquired a 20 percent stake in SBD through these 2013 and 2014 investments, which totaled $1.07 million at an implied $5 million valuation.

---

[11] *See gen.* Mitchell, Billy, "CIA quietly awards C2E cloud contract possibly worth billions," Nov. 20, 2020, *available at* https://fedscoop.com/cia-quietly-awards-billion-dollar-c2e-cloud-contract/ (last visited July 31, 2025).

[12] *See gen.* U.S. Department of Defense Press Release, "Department of Defense Announces Joint Warfighting Cloud Capability Procurement," Dec. 7, 2022, *available at* https://www.defense.gov/News/Releases/Release/Article/3239378/department-of-defense-announces-joint-warfighting-cloud-capability-procurement/ (last visited July 31, 2025).

76.     It is a matter of public record that Pienaar was romantically involved with – and later married – Amazon's Carlson (Donnelly's client) in March 2020.

77.     Upon information and belief, securing the JEDI contract for Amazon would have been a highly lucrative, career-defining success for Carlson. Securing a 10-year cloud computing monopoly at DoD was obviously important for Amazon.

78.     For many years prior to 2017, Donnelly and Pienaar acted on behalf of Amazon to tout its cloud services to governments around the world.

79.     C5 was a constant presence as a sponsor at Amazon cloud conferences during the relevant time. Indeed, Vanity Fair quoted Carlson, then Vice President at Amazon, as having said in 2017, "we've been partnering with C5 around the world for a long time."

80.     Carlson's maiden name is "Hatfield." Upon information and belief, her personal holding company, Hatfield Partners LLC, is currently a major investor in C5.

81.     Donnelly, SBD Advisors, Carlson, Amazon, Pienaar and C5 were therefore commercially, financially, and personally intertwined for many years.

**B. Donnelly and the JEDI Cloud Acquisition**

82.     In 2017, Donnelly entered DoD as Senior Advisor to the Secretary of Defense. Donnelly's SBD business partner, Anthony DeMartino, became Chief of Staff to the Deputy Secretary of Defense. Both Donnelly and DeMartino were centrally positioned to influence DoD cloud policy for Amazon.

83.     As noted above, unlike a traditional technology acquisition, the JEDI procurement emerged directly out of the Office of the Secretary of Defense and the Deputy Secretary of Defense, in the form of a Directive issued by the Deputy Secretary in September 2017 … "the Secretary wanted it done."

14

84. Donnelly and DeMartino – both former principals at SBD and Amazon lobbyists – participated directly in the preparation of that memorandum in their roles as Senior Advisor to the Secretary of Defense and Chief of Staff to the Deputy Secretary.

85. At the time, Glueck and others believed that DoD's approach had been improperly influenced and that it was at odds with commercial best practices. Utilizing the Freedom of Information Act ("FOIA"), Glueck uncovered dozens of emails reflecting Donnelly's direct involvement in DoD cloud acquisition and her wholly inappropriate advocacy for her former client, Amazon, in clear in violation of the Joint Ethics Regulation ("JER").

86. Upon entering DoD as a full-time employee, Donnelly claimed she had divested from SBD. Upon information and belief, she further understood her obligations to recuse from any matter that could benefit Amazon. Donnelly admitted as much in internal emails. As she conceded in an email to DeMartino, the two could not legally or ethically do anything within DoD to assist Amazon.  In her words: "not our place, not proper."

87. Yet, throughout Donnelly's tenure at DoD, despite her obvious awareness of her recusal obligations, she advocated repeatedly for the commercial interests of Amazon.

88. Donnelly engaged in repeated official acts of benefit to Amazon in email after email and meeting after meeting. An article in ProPublica entitled, "How Amazon and Silicon Valley Seduced the Pentagon," quoted one Pentagon official who labeled Donnelly the "fairy godmother of big tech," a moniker that should speak for itself.[13]

---

[13] *See gen.* Bandler, James, et al., "How Amazon and Silicon Valley Seduced the Pentagon," Aug. 22, 2019, *available at* https://www.propublica.org/article/how-amazon-and-silicon-valley-seduced-the-pentagon (last visited July 31, 2025).

89.     Donnelly facilitated numerous opportunities for high-level "sales pitches" between Jeff Bezos and DoD, as well as between senior DoD officials and Donnelly's former direct client, Amazon's Carlson, each of which violated the JER.

90.     Amazon is a major government contractor and, upon information and belief, knew that engaging its former lobbyist and consultant Donnelly to assist Amazon with a major DoD procurement violated the JER and the Federal Acquisition Regulation ("FAR").

91.     Donnely is a sophisticated Washington insider and former journalist, having spent two decades as a senior editor at *Time* Magazine. She likewise knew that assisting her former client Amazon on matters of policy and procurement violated the JER and the FAR.

92.     Both Amazon and Donnelly conducted themselves without regard for the JER and FAR. Among many other emails, Donnelly praised Amazon CEO Jeff Bezos as "the genius of our age" to secure him a meeting with the Secretary. She worked to "crush the bureaucratic impediments" to the JEDI sole-source for Amazon. She responded to Amazon's request that she "put a bug in some ears" when Amazon's plans were going awry. And she waded into technology matters by labeling competitor cloud offerings "highly questionable."

93.     These four emails alone present a clinic of conflicted and illegal conduct from a senior DoD official on behalf of a former client.  There is much more.

94.     Worse, during all this advocacy, there were well-documented and ongoing financial transactions among and between Donnelly, Pienaar, and Amazon.

## C. Pienaar's Involvement in Donnelly's Supposed Divestment from Her Firm SBD Advisors

95.     Donnelly was legally required to divest her financial interest from her namesake firm, SBD Advisors, prior to entering DoD. Donnelly was further required to file entry and exit financial disclosures as a condition of her appointment.

16

96.     The purpose of these requirements is not controversial. The public is entitled to know whether any outside, prior or current financial considerations influence matters of policy or procurement. Disclosures are further required so that ethics officers can make informed decisions on matters of recusal.

97.     Donnelly signed the mandatory Ethics Pledge established by Executive Order 13770 on January 28, 2017.

98.     Had Donnelly fully divested from SBD in an arms-length transaction, she still would have been required to recuse herself from matters benefiting one of her most important clients and one of the world's largest technology companies seeking DoD contracts, Amazon.

99.     During her entire time at DoD, the purported purchaser of SBD and the purchase price was neither disclosed nor known. The terms of the sale – and the parties involved – was of evident interest to the DoD Standards of Conduct Office ("SOCO").

100.    Upon information and belief, Donnelly obviously knew who purchased her firm and for how much.

101.    Because both the identity of the purchaser of SBD and the dollar amount of the purchase were unknown to DoD throughout Donnelly's tenure at DoD, it was impossible for SOCO to properly evaluate and enforce Donnelly's ethics and recusal obligations.

102.    Ethics administration is based largely on an honor system of self-disclosures, made under the penalty of perjury. The sheer number of government employees precludes in-depth investigation of each one. If information regarding conflicts is not disclosed, it is nearly impossible for ethics officials to make informed decisions regarding recusal and other matters. That's what happened here, intentionally so.

103.    Donnelly and her counsel repeatedly represented that she had fully divested and

was 'free and clear' from SBD before entering DoD. Those representations were false.

104.    There is only one reason why interest in the sale and purchase of SBD became an issue in the first instance: Andre Pienaar. When asked in December 2018, "who is Sally Donnelly and why did you buy her business?" Pienaar responded: "I didn't buy Sally Donnelly's business." Later in the interview, Pienaar repeated: "I didn't buy Sally's business."[14] But he did.





---

[14] *See gen*. https://www.youtube.com/watch?v=20T6OGyhzv8&t=121s

105. That was a simple question answered with a straight-forward lie. That lie is the only reason why the purchase and sale of SBD Advisors ever became an issue. It is the only reason why Pienaar finds himself implicated in this matter. To the extent there is a "conspiracy theory," it is one of Pienaar's own making. It is one of the many reasons why years later Glueck finds himself a victim of Pienaar's defamation.

106. August 2018 brought yet another story about SBD's sale. In an investigative article in the Daily Caller entitled "Government Ethics Watchdogs Fear Amazon's Web of Influence May Have Tainted Pentagon's $10 Billion JEDI Cloud Deal," we learned from an SBD spokesman that, "SBD Advisors was sold to a group of investors led by Win Sheridan."[15] It was not.

107. Donnelly departed DoD in March 2018. Years later, in October 2022, it was finally disclosed that SBD was acquired by VMAP Investor LLC ("VMAP") for $1.56 million pursuant to a contract dated January 19, 2017. VMAP Investors, LLC was registered in Delaware on January 18, 2017, one day before the purported contract. VMAP is purportedly the signatory to that contract. VMAP (now known as C5 Holdings USA LLC) is one of Pienaar's nested C5 entities.

---

[15] *See gen.* Kerr, Andrew, "Government Ethics Watchdogs Fear Amazon's Web Of Influence May Have Tainted Pentagon's $10 Billion JEDI Cloud Deal," Aug. 8, 2018, *available at* https://dailycaller.com/2018/08/08/sally-donnelly-defense-department-jedi-cloud-amazon/ (last visited July 31, 2018).

108.    Upon information and belief, VMAP stands for [V]incent [M]ai [A]ndre [P]ineaar. Vincent Mai was Pienaar largest C5 investor.

## STATE OF DELAWARE
## CERTIFICATE OF AMENDMENT

1.    Name of Limited Liability Company: VMAP Investor LLC

2.    The Certificate of Formation of the limited liability company is hereby amended as follows:

> The name of the limited liability company is changed to "C5 Holdings USA LLC."

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the 7th day of December , A.D. 2021.

By: _____
Authorized Person(s)

Name: VINCENT MAI
Print or Type

109.    On December 7, 2021 VMAP simply changed its name to C5 Holdings USA LLC.

110.    The disclosure of VMAP (C5) was forced by a U.S. Senate Committee investigation into the JEDI/SBD matter.

111.    In sworn testimony, Donnelly was asked, "and who did you sell SBD Advisors to?" She responded, "Andre Pienaar organized the sale of SBD." That answer was a semantic mind trick unless "organized" means Pienaar bought it himself through VMAP.

112.    Had it been known in 2017 that a C5-related entity (controlled/owned by Pienaar) had purchased SBD, Donnelly would have faced additional recusal scrutiny because C5 was a commercial partner of Amazon. With those facts in hand, upon information and belief, SOCO would have forced Donnelly to recuse from technology matters related to Amazon.

113.    Amazon was paying C5/SBD and C5/SBD was paying Donnelly while Donnelly was assisting Amazon in its pursuit of DoD cloud contracts. "I didn't buy Sally's business," was Pienaar's original lie that created this controversy in the first place.

114.    But that is not all. Pienaar was asked by a reporter at the October 30, 2024 Pienaar/Glover press conference about the business relationship between Amazon and C5 included in Glueck's PowerPoint:

> Reporter: "C5 does not play any role anywhere in the world in selling Amazon AWS cloud services to governments or private?"

> Pienaar answered, "No."

> Reporter: "Okay, got it. This part of the dossier, the purely business part is also false?"

> Pienaar answered, "Yes."

115.    Each of those answers was likewise a lie. It is indisputable that C5 and Amazon Web Services ("AWS") had extensive business relationships during the relevant period. C5 and AWS co-branding was ubiquitous at AWS conferences, and Pienaar was interviewed next to Amazon's Max Peterson at the AWS Public Sector Summit in 2017:





116.    Further, internal C5 emails make clear that Pienaar and C5 were directly involved in driving "AWS sales," as the email plainly states:

**Answers to questions**
1 message

Andre Pienaar <andre.pienaar@c5capital.com>                    24 August 2016 at 21:12
To: "okanlar@amazon.com" <okanlar@amazon.com>
Cc: Tricia Davis-Muffet <davismup@amazon.com>, "tadander@amazon.com" <tadander@amazon.com>, Andre Van der Post <andrevdp@amazon.com>, Pippa Streatfeild <pippa.streatfeild@c5capital.com>, Kate MacGowan

---

2. MENA Scalerator International Roadshow, 9-18 October

The objectives of the road show are-

To help drive AWS public sector cloud adoption in the region by engaging opinion makers, governments and multilateral organisations

To raise awareness of the AWS/C5 Scalerator and the role it plays in creating jobs, driving innovation and transferring skills with the above

To form partnerships that can help us build the cohort pipeline from the region of high quality scale ups and start ups that can help drive AWS sales

---

117.    Pienaar was the purchaser of Donnelly's firm and Pienaar and Amazon had an obvious commercial relationship. When Pienaar was asked at the October 2024 Pienaar/Glover press conference, "C5 does not play any role anywhere in the world in selling Amazon AWS cloud services to governments or private?" Pienaar answer: "No."

118.    Pienaar's denial was obviously a lie in Pienaar's own words. Pienaar is the author of the above cited email "to drive AWS sales" to "governments" around the world.

119.    But even Amazon remembers it differently and agrees with Glueck's PowerPoint. Amazon stated in a blog post, "in April of 2017, C5 became part of the AWS Partner Network (APN) Channel Reseller Program for one deal supporting the Bahrain Information and eGovernment Authority (iGA)." Amazon's candid statement reveals Pienaar's denial as yet another lie.

120.    In March 2017, Donnelly organized an intimate dinner event with Secretary Mattis at one of London's most exclusive member-only clubs. In attendance at the dinner were Donnelly, Pienaar, and Carlson, among a few others:

23

---

**DETAILED ITINERARY**

18:30 - 20:00    **Dinner**
*Principal, Faller, Donnelly*
General Graeme Lamb, Host
General David Richards
Major General James Chiswell
Minister Tobias Ellwood
Cheryl Plumridge
Teresa Carlson
Andrew Pienaar

**Off the Record - Listening Mode**

---

121.    Against the backdrop of Pienaar's purchase of Donnelly's firm and Amazon's commercial relationship with Pienaar, that dinner was a black letter violation of the JER. The only reason it was permitted by Pentagon ethics officials is because Donnelly and Pienaar failed to disclose their financial and business relationships.

122.    The London dinner became interesting because Pienaar lied about that as well. When asked in 2018 about whether he had interacted with Donnelly while she was in government, he said, "Since Sally and Tony [DeMartino] went to do public service, we've had no contact with them. We had no reasonable cause to have contact with them in any way." Another lie. It is not true, nor is it credible, that Pienaar failed to remember a private dinner at London's most exclusive club with the U.S. Secretary of Defense and Donnelly, his former business partner.[16]

123.    In May 2017, two months after the dinner, and four months after Donnelly entered DoD, Donnelly belatedly filed her Office of Government Ethics ("OGE") Form 278. She claimed to have received $390,000 for the "partial sale" of her firm, which she valued between $1 million and $5 million.

---

[16] *See gen.* https://www.youtube.com/watch?v=20T6OGyhzv8&t=121s

124.     Donnelly did not disclose the purchaser of the firm as VMAP (Pienaar/C5), the supposed sale price ($1.56 million), or any payment schedule. She simply attested that she received $390,000 in income from SBD for "Partial sale/SBD." Pursuant to the terms of the OGE Form 278 those statements were sworn to be "true, complete, and correct to the best of [her] knowledge." They were not.

125.     On August 27, 2017, in response to an inquiry from SOCO, DoD's ethics office, regarding the listing of "Partial Sale/SBD" as a source of income, Donnelly told a SOCO attorney that "she sold her membership units in the company … and had no financial interest in the company."  That was untrue because Donnelly was purportedly paid additional sums of money over time.

126.     Significantly, Donnelly further stated "she derived no income from SBD Advisors." Relying on Donnelly's representations, on August 30, 2017, SOCO memorialized its communications with Donnelly regarding SBD: "Confirmed that this asset actually has $0 value to filer as she no longer has any stake in the company. Filer confirmed this was total sale of filer's partial interest." Also, untrue. It never made objective sense that $390,000 was the total sum of Donnelly's consideration for her total stake in SBD.

127.     Even though the purchaser and purchase price were obviously known to Donnelly, nothing about the $1.56 million purchase agreement or VMAP (Pienaar/C5) was ever disclosed.

128.     It is not possible that "she derived no income from SBD Advisors," or that the asset had "$0 value to the filer," or that "[Donnelly] confirmed this was the total sale of [her] partial interest," if she was owed more than $1 million from the sale.

129.     Donnelly filed a correction to her disclosures in February 2018. Yet again, she did not disclose any additional income from the sale of SBD Advisors. Again, no mention of VMAP

(Pienaar/C5) or $1.56 million in the February amendment. In fact, at no point while she worked at the DoD, did she disclose to anyone that she was paid anything more than $390,000 for her interest in SBD.[17]

130.    Worse, on March 27, 2018 – three days before Donnelly exited the DoD – ITC Secure, another portfolio company of Pienaar and C5, acquired a 51 percent stake in SBD Advisors for $1.07 million.

131.    Pienaar issued a press release the following week stating, "[w]e are delighted with the world class SBD team joining the growing ITC Group. SBD brings a deep bench of experienced national security leaders to help advise customers at both Board and Operational levels on cyber strategy."

132.    The above statement is highly misleading because Pienaar had purchased SBD 15 months earlier through VMAP (a.k.a. C5 Holdings USA LLC), a fact that was not publicly known at the time.

133.    Upon information and belief, the reason for the bizarrely inconsistent public statement was to cover for – and launder – Pienaar's prior lie about not buying Donnelly's firm.

134.    Various government records confirm that Donnelly had not severed ties with SBD when she joined the DoD in January 2017 as she had claimed to have done. For example, in March 2017 – three months after her supposed divestiture – SBD's corporate lawyer (and Donnelly's personal lawyer) Kristen Verderame filed a corporate registration document in D.C. listing Donnelly as the sole "governor" of SBD.

---

[17] Years later, in September 2019, Donnelly's counsel claimed Donnelly was paid $390,000 in each of March 2017, July 2017, and March 2018 in addition to the initial $390,000 presumably paid in January 2017.  This proffer is inconsistent with Donnelly's contemporaneous interactions with SOCO in August 2017 and February 2018. According to this proffer, by February 2018 Donnelly should have received $1,170,000 yet she only ever disclosed $390,000.

| Two-Year Report for Domestic & Foreign Filing Entity | |
| --- | --- |
| **Year of Filing:** 2017 | |
| **File Number:** L0000056521 | |
| **Date of Filing:** 3/5/2017 4:08 PM | |

**Fourth:** Name of Registered Agent and address of registered office in DC:
Kristen Verderame
1747 Pennsylvania Avenue, NW
Suite 210
Washington, District of Columbia 20006

**Fifth:** Brief statement of business affairs conducted in DC:
Other
consulting

**Sixth:** List all entity governors (attach list if needed):

| Name | Address |
| --- | --- |
| Sally Donnelly | 1747 Pennsylvania Avenue NW, 2nd Floor, Washington, District of Columbia 20006 |

135.    In May 2018, two months after the ITC (C5) transaction and Donnelly's departure from DoD, Donnelly filed her exit financial disclosure OGE Form 278.

136.    For the first time, Donnelly disclosed the receipt of additional income from the sale of SBD: another $1.17 million. That $1.17 million – plus the previously disclosed $390,000 – equals precisely the $1.56 million for which she purportedly sold her firm 18 months earlier. To be clear, this means that for Donnelly's entire tenure at DoD she was owed more than $1 million from the sale of SBD.

137.    Yet, her counsel claimed on the record in August 2018 that Donnelly "sold her entire stake in SBD Advisors before setting foot in the Pentagon on Jan. 21, 2017. From that moment forward, she has had absolutely no financial or other interest in SBD Advisors or its clients."  That statement was obviously false as it is irreconcilable with the facts. Being owed $1 million is practically the definition of having a "financial interest."

138.     The funds for the March 2018 ITC (C5) acquisition came while Amazon was paying C5/SBD for "consulting" services and during a period in which Donnelly was advocating aggressively for Amazon.

139.     A further inexplicable transaction involving SBD came in August 2022, when C5/ITC acquired the remaining 49 percent of SBD for $2.43 million, on top of the $1.56 million that Donnelly was already paid and on top of the $1.07 million C5/ITC paid for 51 percent, even though SBD was considered "dormant" and "inactive," according to public records. Upon information and belief, SBD was not a going concern by 2022, raising the question of who was paid $2.43 million, pursuant to what agreement, and for what purpose?

140.     The August 2022 purchase cemented the valuation of SBD. Pienaar invested $1 million for 20 percent ($5 million valuation) *plus* the $1.56 million Donnelly claims she received in 2017 *plus* the $2.43 million in 2022, all of which total $5 million. This is precisely the valuation ascribed to Pienaar's initial 20 percent investment years earlier.

141.     In the end, what is clear is that Pienaar/VMAP acquired Donnelly's firm in January 2017 and owned it in its entirety in 2022. In between, apparently $4 million moved around between a slew of proper nouns including possibly Win Sheridan, Vincent Mai, Mick Davis, and others to create the illusion that Pienaar was not the principal. Pienaar asserts that he paid a little over $1 million for 51 percent of the company in 2018 and then paid nearly $2.5 million for the other 49 percent in 2022, even though internal SBD documents and public records showed SBD had no material operations or value by 2022. Pienaar and Donnelly would have you believe that Donnelly received less for her namesake firm – a total of $1.56 million – then the supposed investors brought in to facilitate the cover story and round trip the shares back to Pienaar. And, Pienaar would have

you believe that Donnelly was "free and clear" of all of this, as he stated at the Pienaar/Glover press meeting. There may be a conspiracy, but it did not involve Glueck.

142.    Pienaar claimed at the October 2024 Pienaar/Glover press conference that Donnelly sold her interest in the business "before she went into government, did all of that with the cooperation of the ethics officer and with the DoD's knowledge." That is obviously untrue as evidenced by the well documented series of lies: "I didn't buy Sally's firm." If Donnelly did not disclose it and Pienaar lied about it, how exactly was DoD supposed to make an informed assessment of the transaction?

143.    Throughout this entire time, Donnelly and Pienaar each engaged in a semantic game of "catch me if you can" usually reserved for the sovereign citizen movement. The result of their view of the law is that the plain meaning of the JER does not apply to them.

144.    Glueck had no part in Pienaar and C5 acquiring all or part of SBD *on four separate occasions.* Glueck had no part in C5 and Amazon's well-documented commercial partnership. Glueck had no part in Donnelly's well-documented, conflicted advocacy on behalf of Amazon. Glueck did not tell Donnelly or Pienaar to make obviously false statements about the sale of SBD or their proximity to Amazon's commercial interests. Those facts may be inconvenient for Pienaar and Donnelly, but they are publicly recorded and true.

145.    In fact, in April 2021, to ensure that Glueck's statements were accurate, Glueck sent an email to Sally Donnelly which stated, "if there are any facts in my letter that are untrue, I stand ready to publicly correct them. Would be happy to discuss at your convenience." Donnelly responded by forwarding the previously issued statement by her attorney.

146.    More to the point, transparently documenting and reporting facts to oversight bodies, law enforcement, and the media involving matters of public interest is most certainly not

surreptitiously "creating a dossier" and engaging in "a clandestine campaign" as Pienaar's defamatory framing sought to convince the assembled journalists.

### D. The Preparation of the PowerPoint Presentation

147.    Against the backdrop of Donnelly and Pienaar's conduct, Glueck conducted an open-source, fact-driven review to obtain documentary evidence that corroborated the veracity of the wrongdoing described herein. The sources of this information included public records in the U.S. and in various foreign jurisdictions, as well as documents received through FOIA requests.

148.    A $10 billion, 10-year cloud computing contract is a matter of significant public interest (and potentially public corruption) and Glueck prepared a series of rigorously documented and vetted PowerPoint presentations, versions of which were delivered to law enforcement and Congressional oversight committees. As JEDI was also of intense media interest at the time – as you would expect of any major defense contract – Glueck presented this information to members of the media. He did so personally, without anonymity.

149.    It would take remarkable, reckless hubris to deliver a presentation based on fraudulent, "fabricated" information – as Pienaar alleges – to the Fraud Section of the Department of Justice or to the Public Corruption Division of the Eastern District of Virginia.

150.    Yet Glueck confidently provided the presentation to those offices and other law enforcement audiences, because there is absolutely nothing fraudulent about it.

151.    Every word of every presentation was based on a good faith belief in the accuracy of the facts presented. Glueck stands by the facts and is unaware, even to this day, of any fact included in the presentations that has been meaningfully rebutted, let alone disproved.

152.    And perhaps most importantly, the PowerPoint has nothing to do with IronNet.

153.    Pienaar and C5 have long known about the evidence assembled by Glueck in the PowerPoints he provided to various oversight government offices. Indeed, C5 commented publicly on Glueck's presentations years ago. For example, in an article published in January 2019, a C5 spokesman described Glueck "circulating a presentation highlighting" what the C5 spokesman characterized as "unsubstantiated links among AWS, C5 and [Viktor] Vekselberg." Glueck is personally identified and quoted on the record in the same story responding to C5's complaint about his PowerPoint: "The truth hurts."

154.    In a July 2023 letter to the Senate Judiciary Committee, Pienaar's counsel stated: "None of these facts have prevented Oracle from attempting to spread its conspiracy theories through Congress and in the media." Obviously, Pienaar did not "discover" in Summer 2024 that Glueck was the author of a PowerPoint that Pienaar himself attributed to Glueck in July 2023.

155.    Far from shying away from his authorship of the various PowerPoints and the detailed evidence they contain, Glueck had the central figures in the PowerPoint (including Pienaar) and their commercial relationships displayed on a large posterboard placed in his office window at street level on K Street, in Washington, D.C.

156.    In July 2019, CNN published an article noting this public display of the evidence Glueck had uncovered: "The chart features the faces of a number of former Pentagon officials, current Amazon employees and executives, as well as consultants working on behalf of Amazon, connecting them together in a criss-cross of business and professional ties…A blown-up copy of the chart is visible from the street, perched in a window at Glueck's K Street office in downtown Washington."[18]

---

[18] *See gen.* Warren, Michael, et al., "Exclusive: Inside the effort to turn Trump against Amazon's bid for a $10 billion contract," July 27, 2019, *available at*

157.    Glueck once again commented on the record for that story, publicly embracing the efforts he had made to draw attention to these important matters of public interest.

158.    In the October 2024 Pienaar/Glover press meeting, Pienaar claimed that Glueck's efforts to draw attention to the information in the PowerPoint presentations represented a "clandestine campaign."

159.    One can imagine tactics that could fairly be described as "clandestine." If Glueck was attempting to distance himself from the allegations, repeatedly commenting on the record to the media and blowing up a summary of the PowerPoint and placing it, facing outward, in his K Street office window was probably not the best way to preserve anonymity.

### E.  Pienaar's Failed Investment in IronNet, Fraud Litigation and Bankruptcy

160.    Skip forward to the fall of 2023, and the collapse of IronNet.

161.    In May 2018, C5 Capital led a $78 million Series B financing round by injecting $35 million into IronNet. Two years later, in 2020, C5 purchased an additional $25 million of IronNet stock, bringing C5's total investment to $60 million.

162.    IronNet was then taken public through a SPAC merger in August 2021. IronNet's revenue was artificially inflated by C5, which contracted a significant portion of IronNet's earnings prior to its IPO through a non-existent nonprofit.

163.    In December 2021, IronNet downgraded its annual recurring revenue projections by 60%. A year later, IronNet lacked the funds required to pay its bills. The company filed for bankruptcy in October 2023.

---

https://www.cnn.com/2019/07/26/politics/oracle-trump-amazon-defense-contract-conspiracy (last visited July 31, 2025).

164.   Watching its investment collapse, C5 provided more than $10 million in loans to facilitate IronNet's bankruptcy, securing the loans with the entirety of C5's Fund 2 portfolio (held through Luxembourg-based C5 Cyber Partners II SCSp-RAIF).

165.   C5 then took IronNet private in February 2024 and has continued to rely on loans to fund the company's increasingly minimal operations. IronNet now owes its creditors tens of millions of dollars and is facing Chapter 7 liquidation.

166.   As described above, in 2023, an investigative reporter for the AP – Alan Suderman – was investigating IronNet and, as part of that investigation, contacted various potential sources. Pienaar sued Suderman *personally* for $10 million for defamation in September 2023 long before any article was published.

167.   On October 2, 2024, the AP finally published the story, entitled "Collapse of National Security Elites Cyber Firm Leaves Bitter Wake."

168.   Upon information and belief, facing a $10 million anticipatory defamation lawsuit, it is hard to imagine a story more rigorously edited and vetted than Suderman's article.

169.   Included in the eventually published story were the following detailed statements from his own former business associates:

     a.   "'I'm honestly ashamed that I was ever an executive at that company,' said Mark Berly, a former IronNet vice president. He said the company's top leaders cultivated a culture of deceit 'just like Theranos,' the once highly touted blood-testing firm that became a symbol of corporate fraud."

     b.   "Pienaar also worked at the time to help Russian oligarch Viktor Vekselberg cement relationships with London's rich and famous, according to William Lofgren, a former CIA officer and G3 co-founder. 'The relationship was steady

33

and frequent because both Andre and Vekselberg saw merit in it,' said
Lofgren."

    c.   "C5 had signed two multi-year customer contracts with IronNet for $5.2
million, according to internal C5 records. Contracts of that size were typical for
large clients with thousands of employees, not a small investment firm like C5
that had a couple dozen employees and partners, former IronNet employees
said. 'That's an inflated number,' said Eddie Potter, a former top sales executive
at IronNet, when told by the AP of the size of C5's contracts with IronNet. He
added there was 'no way' that C5 required services "worth $5 million."

170.    Through counsel, Pienaar commented about IronNet: "Any accusation that IronNet
has been anything other than successful is categorically false, his attorneys told the AP."

171.    Perhaps one measurement that IronNet has been something "other than successful"
is its pending bankruptcy proceeding, which the U.S. Trustee has moved to convert from a
reorganization to a liquidation.

172.    Regardless, the AP article quotes various sources for its reporting on Pienaar's ties
with sanctioned Russian oligarch Viktor Vekselberg. Glueck is not one of them. He is nowhere
mentioned in the article, nor is JEDI. Glueck has no relationship with Suderman or the AP.

**F.  Pienaar and Glover Organized a Meeting With Journalists to Attack and Defame
    Glueck**

173.    By 2024, years after the JEDI procurement was cancelled, Pienaar retained Glover.
By this time the focus was not on JEDI, but on IronNet. Pienaar had staked his personal reputation
and C5's assets on an IronNet turnaround.

174.    The status of the IronNet bankruptcy is well-documented in public court filings.

175.    Not surprisingly, the public nature of the IronNet debacle had become of interest to the mainstream media, including the AP, and Pienaar needed to create an alternative narrative.

176.    Upon information and belief, that narrative was conjured by Pienaar and Glover to redirect attention from the fraud at IronNet and cast Pienaar as the victim of a "dossier" and "clandestine campaign" orchestrated by Glueck.

177.    Glover invited journalists to attend a meeting at her Washington, D.C. home on October 30, 2024. To ensure attendance for Pienaar's part, she preceded the Glueck defamation with a conversation with U.S. Senator Mark Warner, Vice Chairman of the Senate Intelligence Committee on election integrity. After Senator Warner departed, Pienaar began, "well, thank you so much for staying."

178.    At this October 2024 press meeting, Pienaar and Glover presented numerous false, incomplete, and misleading statements and omitted crucial facts concerning Pienaar's background, the sale of SBD, the PowerPoint presentation (the "dossier" as Defendants pejoratively refer to it) and other presentations Glueck submitted to government oversight authorities.

179.    To provide the pretext for their defamation, and manufacture timing they believed might frame their lies as newsworthy, Glover and Pienaar claimed that they had "only recently," "just this summer [2024]" learned that Glueck was the source of the PowerPoint about JEDI.

180.    That is simply false. As noted above, Pienaar has known for years that Glueck had uncovered Pienaar and Donnelly's misconduct and reported it to various authorities in a series of PowerPoint presentations. C5's spokesman discussed it on the record in 2019 and so did Glueck – not to mention the poster on K Street.

181.    Pienaar and Glover provided the assembled journalists in October 2024 with a copy of a PowerPoint prepared by Glueck that dates from 2022. The metadata of the electronic file that

was printed and handed to journalists proves that Pienaar received it from one of the oversight Committees to which Glueck provided it. Pienaar's correspondence with the Committee makes clear that Pienaar knew exactly what was in the PowerPoint, as well as who created it.

182.     Pienaar and Glover proceeded to deliver to the assembled journalists a defamatory rant about Glueck while detouring into a fantastical, largely fictional, autobiography of Pienaar. He spoke of his "encyclopedic knowledge," his "client" Nelson Mandela, the "Fleming Family, of Ian Fleming fame," the "FBI," "CIA," "M16." "I've been advisor to the King." "I advised the eighth Duke of Westminster." Pienaar claimed that he helped the DEA nab the Russian arms dealer 'Merchant of Death' Viktor Bout. Pedigree by proximity was the main thrust of Pienaar's pitch. Pay no attention to the man behind the curtain.

183.     In between burnishing Pienaar's supposed resume, the drumbeat of the October 2024 press meeting was that Glueck is a vindictive liar who knowingly used fake and fraudulent documents in the PowerPoint presentation to smear Pienaar and "destroy people."

184.     Glueck somehow caused "Carlson to lose her Global Entry status," because she was "placed on a watchlist of American citizens that allegedly had links with the Russians," according to Pienaar and Glover. To the extent that vignette is even truthful, a more straight-forward explanation might be that Pienaar has links with sanctioned persons, though Glueck leaves that to law enforcement to assess. Thankfully, according to Pienaar's telling, he was personally able to intervene with the DoJ and DHS to get it restored. Glueck has no interest in Carlson's travel or the supposed restrictions associated with her husband.

185.     Defendants repeatedly denied that Suderman's article – published into the teeth of Pienaar's pending $10 million personal defamation suit – was a good faith attempt to report the facts. They attribute everything that the AP printed to Glueck:

a. "The AP article was purely a vehicle to run the dossier on Andre. That's all that article was."

b. "The reason this is important" is because Glueck's PowerPoint, which they handed out, was "based on documents that are fraudulent."

c. "There's the AP article that ran based on fraudulent documents."

d. "This perfect set of circumstances lines up where the AP is able to rely on fraudulent documents."

186.   Defendants then impugned Glueck's motives and his character. They claim that Glueck's go-to tactic is to "spin up artificial narratives on people," that Glueck supposedly knows are false, and then "use those narratives to destroy people." They went further, claiming to assembled journalists that Glueck "like[s] being known for going after people."

187.   Glover claimed that she had discussed Glueck's love of going after people with false narratives with others. She then falsely told the journalists that others had warned her that Glueck will "come after you" and that Glueck wants to be known in this way.

188.   Glover premised her most outrageous claims with the proviso that they were "off the record."  For example, "…and this is off the record. The AP article was purely a vehicle to run the dossier on Andre. That's all that article was."

189.   Glover should know that prefacing defamation as "off the record" is not some talismanic shield to liability. It is a journalistic norm that means they won't print your comment, not that you didn't say it. Saying she was defaming Glueck "off-the-record" does not insulate her from liability, but it does help to show her awareness of guilt. Indeed, on that evening Glover helpfully used "off the record" as sort of a poker tell, revealing she knows that she is about to make especially explosive claims.

190.     Notably, had Pienaar and Glover really believed any of this, there was a pending defamation suit in which Pienaar could have supported such a charge. Pienaar's lawsuit against Suderman was a year old, had cleared a motion to dismiss, and was headed into discovery. They could have deposed Glueck under oath. Instead, they chose to defame him, behind his back, but face-to-face with serious D.C. journalists.

191.     Moreover, they could have come to the assembled journalists with simple proof that Glueck's central assertion – that Pienaar fraudulently acquired Donnelly's firm on multiple occasions – was untrue. They did nothing of the kind. Seven years later, a supposedly simple $1.5 million transaction remains mired in opacity and now Pienaar claims that the PowerPoint detailing Pienaar's relations with Donnelly and Amazon was based on fraudulent documentation.

192.     Pienaar and Glover told the assembled journalists the following malicious lies that defamed Glueck.  They claimed that:

- Glueck based the PowerPoint that he had given to law enforcement on "fraudulent documents" and "false documentation that are clearly provable to be false."

- Glueck's summary of the sale of Donnelly's firm was knowingly false and that Glueck had knowingly and wrongly accused Pienaar of being "involved in the corrupt transaction with Sally Donnelly."

- Glueck had falsely seeded the portions of the AP article detailing Pienaar's prior relationships with a sanctioned Russian oligarch, and that Glueck had caused Pienaar to be labeled "a malign and bad actor that's associated with Russia" and that this claim was knowingly based on fraudulent documents; and

- Glueck's modus operandi is to "spin up some artificial narratives on people," "shop those narratives to the media," and then "use those narratives to destroy people."

193.     Taken together, the statements by Pienaar and Glover point to a simple and straightforward conclusion: that Glueck manufactured a false PowerPoint using fraudulent, "fabricated" documents and knowingly provided it to various audiences to smear innocent people.

194.    Each of these assertions about Glueck are demonstrably false. And Defendants either knew, or recklessly disregarded, that they are false.

195.    Meanwhile, at the October 2024 press meeting, Pienaar whitewashed his extensive record of collaborating with unsavory clients as a private intelligence operative, all while painting himself as a consigliere to then-Prince Charles and Nelson Mandela. As Pienaar repeatedly digressed into excruciating self-flattery and minutiae of his supposed record, Glover would interrupt him and steer him back to the purpose of their meeting: defaming Glueck.

196.    In truth, Pienaar's former business partner (indeed co-founder) went on-the-record to the AP that Pienaar had a longstanding relationship with Russian oligarch Vekselberg: "Pienaar also worked at the time to help Russian oligarch Viktor Vekselberg cement relationships with London's rich and famous, according to William Lofgren, a former CIA officer and G3 co-founder. 'The relationship was steady and frequent because both Andre and Vekselberg saw merit in it.'"

### G. Pienaar Falsely Denied Having Facilitated Amazon's Black Letter Bribery Scheme

197.    Pienaar labels Glueck's assertions a "wild conspiracy theory," to the media as if Glueck wrote his PowerPoints from a booth at Comet Ping Pong Pizzeria.[19]  Unfortunately for Pienaar, verifiable facts support every assertion Glueck ever made, including internal documents from the files of Amazon, SBD, and C5.

198.    Donnelly entered DoD on January 21, 2017. She supposedly sold her firm to Pienaar two days earlier, on January 19, 2017.

199.    Two weeks before she sold her firm to Pienaar, Amazon signed a work order with

---

[19] *See gen.* Hugh, Cameron, "US Cybersecurity Exec Slams Russian Oligarch Claim: 'Conspiracy Theory,'" Oct. 10, 2024, *available at* https://www.newsweek.com/ironnet-boss-responds-russian-conspiracy-1965995 (last visited July 31, 2025).

SBD to provide cloud sales consulting services. The Work Order is signed on Amazon's side by Max Peterson, who reported directly to Teresa Carlson at Amazon (and who was interviewed with Pienaar at an AWS conference later that year). Tony DeMartino, days before he became Chief of Staff for the Deputy Secretary of Defense, signed for SBD Advisors:

| Amazon: | Contractor: |
|---|---|
| Amazon Web Services, Inc. | SBD Advisors LLC |
| DocuSigned by: *Max Peterson* | DocuSigned by: *Tony DeMartino* |
| By _____9584C38B888411E7_____ | By: _____BE4D939F889...Tony DeMartino_____ |
| Printed Name: Max Peterson | Printed Name: |
| Title: AWS Vice President | Title: Managing Director, SBD |
| Date Signed: January 3, 2017 | Date Signed: January 3, 2017 |

200.   One of the last things DeMartino did before leaving SBD was to sign this work order. One of the first things he did after arriving at DoD was to reach out to the counterparty to that work order, Amazon.

201.   On February 11, 2017, DeMartino emailed Amazon's Carlson to "coordinate a meeting the next time you are in the DC area." He celebrated in the email, "Good news is Sally [Donnelly] remains almost right next door, so happy there!" In March 2017, he followed up, "Teresa, we never locked in a date for you to meet with the Chief of Staff. If you are still interested, please let us know when you are available to come in." DeMartino of course knew that Carlson was paying SBD Advisors because he had personally signed the work order weeks earlier. This is a clear violation of the JER.

202.   This work order makes clear that by January 2017 Pienaar owned a firm under contract with AWS to help them sell cloud to the DoD.

203.    In January 2018, the Amazon contract with SBD (now owned by VMAP/C5/Pienaar) was up for renewal. The contract was renewed by Amazon with crystal clear objectives and timelines, as shown below:

---

**1. Description of Project Services:** Contractor will serve as information brokers and engage key influencers to improve Department of Defense (DoD) and Military Service senior leader understanding of and confidence in Amazon Web Services, as demonstrated through indicators of favorable policies and movement towards procurement activity, helping bring commercial cloud and its attributes (security, agility, affordability) to the US defense market. Specifically, Contractor will:

- Engage its key senior leaders and advisors to provide individual perspectives and discreet counsel to both AWS and DoD officials on a regular basis. The purpose of such counsel is to ensure DoD senior leaders understand the services and benefits offered by AWS, and maximize the chance of the enactment of policies favorable to AWS and movement towards cloud procurement. This work will include efforts to avoid and counter potential obstacles and roadblocks to AWS's objectives.

- Engage senior DoD leaders and provide AWS with ongoing assessments and monitoring of the current state of play among the key stakeholders in the DoD.

- Assist AWS in initiating engagement with senior, strategic DoD stakeholders and leaders based on SBD's networks, and assist AWS with messaging during such engagements.

- Provide AWS counsel and recommendations at the tactical, operational and strategic levels, including counsel and recommendations for future activities and messaging that will effectively position AWS to meet the objectives described above.

- Provide AWS with a written Status Report each month that details the Contractor's efforts and demonstrable progress towards the objectives described above.

---

204.    It is hard to imagine clearer detail in a work order that had a very short three-month duration, oddly expiring at the end of March 2018. Nor could this have been an oversight on Amazon's part. By early 2018 there had already been substantial public controversy about the JEDI cloud procurement and Donnelly's role.

205.    This work order proves AWS hired C5 – which owned SBD Advisors – to "maximize the chance of the enactment of policies favorable to AWS and movement towards cloud procurement." This work order occurred while SBD continued to pay Donnelly or at least owed her significant sums money.

206.    Meanwhile, on January 4, 2018, the Deputy Secretary of Defense issued a revised JEDI directive memorandum to procure enterprise cloud for the DoD. So, as of January 4, 2018, there can be no debate that an active procurement was underway.

207.    Two weeks later, on January 17, 2018, an off the record, four-person private dinner was arranged at a downtown Washington, D.C. restaurant attended by the Secretary of Defense, Amazon CEO Jeff Bezos, Donnelly, and Amazon's Carlson. As the work order states, Amazon was paying SBD (owned by Pienaar) to "enact policies favorable to AWS and movement towards cloud procurement" with "discrete counsel to DoD officials."

208.    And the topic of the dinner was AWS Cloud, as Carlson informed Donnelly hours before the dinner started.

| | |
|---|---|
| **From:** | Carlson, Teresa |
| **To:** | Donnelly, Sally SES SD |
| **Cc:** | Block, Steven; Chronis, Jennifer; Ali, Tram |
| **Subject:** | AWS Fact Sheet |
| **Date:** | Wednesday, January 17, 2018 2:37:26 PM |
| **Attachments:** | AWS Fact Sheet final.docx |

Dear Sally,

For your review, attached you'll find:

1) AWS Fact Sheet

My best,

Teresa

209.    That private, off the record dinner – on January 17, 2018 – occurred during the JEDI procurement and is a textbook violation the FAR and the JER. Indeed, it is hard to imagine a more inappropriate private dinner than the one arranged by Donnelly and Carlson, with the Secretary of Defense and Jeff Bezos – at the time – the world's richest man. Preventing this kind of conduct is exactly why the FAR and JER exist in the first instance. Yet Defendants label Glueck as a purveyor of "wild conspiracy theories."

210.    The required completion date of this contracted three-month work order was March 31, 2018. Perhaps coincidentally, but not publicly disclosed at the time, Donnelly announced her

departure from DoD for March 2018, a short 15 months after joining, and corresponding precisely with the expiration of the work order.

211.    Donnelly has admitted under oath that before she left DoD in March 2018, she was paid $390,000 (from Pienaar/C5) for the sale of SBD as part of her agreement a year earlier.

212.    Also occurring in March 2018, ITC Secure (a C5 company) bought 51 percent of SBD, providing a liquidity event in roughly the same amount Donnelly reported for the first time less than two months later.

213.    So, with real, verifiable documents one can trace a direct line in 2018 within a condensed three-month window of clear public corruption. Amazon signed a contract with SBD Advisors (owned by Pienaar). A $10 billion procurement was announced. Donnelly set up a private dinner with the Secretary of Defense and the CEO of Amazon. Donnelly attended the dinner, as did her former Amazon client representative Carlson. The subject of the dinner was AWS cloud sales. The work order further instructed SBD Advisors to engage with senior DoD leaders to "avoid and counter potential obstacles and roadblocks to AWS's objectives" and to "enact policies favorable to AWS and movement towards cloud procurement." According to Donnelly's attorney, Pienaar/C5 sent Donnelly a check for $390,000 at the end of March – all while Amazon is paying C5. And ITC/C5 buys 51 percent of SBD for approximately $1 million at precisely the same time Donnelly discloses for the first time an additional $1 million in income from the sale of SBD Advisors. The flow of funds from Amazon to C5 (SBD) to Donnelly is undeniable.

214.    The conduct throughout this period could be described many ways but "wild conspiracy theories" peddled with a fake "dossier" through a "clandestine campaign" because Glueck "likes to be known for going after people" is not among them.  Glueck's assertions were fact-based and truthful. Pienaar's retort was defamatory.

### H. The Assertion that Glueck Used Fraudulent Documents in the Slide Deck is False and Defamatory

215. The PowerPoint presentation uses genuine documents that come from publicly available records, news articles, and FOIA requests. Neither Glueck nor anyone else did anything that would make them fraudulent or false.

216. An example that Defendants claimed constitutes a fraudulent document relates to public records regarding Pienaar's involvement in a South African mining venture. Glover declares at the press conference, "your fake document tells you that Andre is on the board of Vekselberg's mine." Pienaar is highly sensitive to his participation in the United Manganese of Kalahari ("UMK") mine because he did so with sanctioned Russian oligarch Viktor Vekselberg.

217. The UMK mine was top of mind as recently as 2023 with a CNN story entitled, "South Africa's stance on Russia puzzles many. Could a mine in the desert hold answers?" The story stated that "the United Manganese of Kalahari (UMK) mines are highly lucrative, and the company has close financial links to sanctioned Russian oligarch Viktor Vekselberg, a key ally of Russian President Vladimir Putin."[20]

218. At the press meeting, Glover stated, "you have two South Africa documents in front of you. The thick document, COR39, is a document that alleges that Andre is on the board of the mining company that Vekselberg owns in South Africa. You have a second South Africa document which is all of the directorship, the list of the directorships where Andre is actually involved in a business in South Africa. Dossier, AP reporting based on false documentation that is clearly provable to be false."

---

[20] *See gen.* McKenzie, David, "South Africa's stance on Russia puzzles many. Could a mine in the desert hold answers?," July 28, 2023, *available at* https://www.cnn.com/2023/07/28/africa/south-africa-russia-manganese-mine-anc-intl-cmd (last visited July 31, 2025).

219.    Pienaar's service on the Board of UMK with Vekselberg is not a "fabricated" "allegation," as Glover asserts. It is a fact. A simple review of the purportedly fraudulent document, and the related facts, shows the staggering bad faith and malice behind Defendants' suggestion that the document is false.

220.    The PowerPoint Defendants discussed included a screenshot from a Lexis WinDeed record. This is a well-known, paid aggregator service that provides corporate data from the South African corporate registry.

221.    The relevant portion of the referenced Lexis WinDeed record is included for reference below:

| PIENAAR, ANDRIES DANIEL FABER | | | |
|---|---|---|---|
| Name | ANDRIES DANIEL FABER | Status | RESIGNED |
| Surname | PIENAAR | Type | DIRECTOR |
| Initials | A D F | Appointment Date | 2017/03/30 |
| ID/Passport Number | 517814284 | Resignation Date | 2018/02/26 |
| Date of Birth | 1970/[REDACTED] | Member Size (%) | - |
| Profession | - | Member Contribution (R) | - |
| Country of Residence | BRITISH INDIAN OCEAN TERRITORY | | |
| Residential Address | APARTMENT 62 SAIL TOWERS BUILDING 52 ROAD 38 BLOCK 428 AL SEEF DISTRICT MNANMA BAHRAIN 0000 | | |

222.    Defendants attempt to discredit this record by highlighting that it wrongly spells Manama, Bahrain as "Mnanma," a clear clerical typo that hardly points to fraud.

223.    Defendants also claim that the "ID/Passport Number" attributed to Pienaar is incorrect. During the October 2024 press conference, Defendants presented the journalists with Pienaar's South African birth certificate, which includes a South African ID number different than

the number displayed above. They pointed to this supposed discrepancy as evidence that this Lexis WinDeed record was a "fake document" and that therefore the PowerPoint was also "based on false documentation that is clearly provable to be false."

224.    The underlying South African Government records confirm the information provided by Lexis WinDeed. The actual corporate registration documents in South Africa for the UMK mine confirm that Pienaar was a board member. Below is a document on the letterhead of one of Vekselberg's Renova Group subsidiaries listing Pienaar as a board member of UMK:

Dear Sirs

**CHANGES TO OUR NOMINEES TO THE BOARD OF UMK**

We hereby notify you of changes we wish to implement in relation to our personnel on the UMK Board of Directors in terms of the UMK shareholders agreement with effect from the date of this letter. Currently we are represented by three directors on the board, namely Mr Andre Pienaar (with Mrs Anel van Niekerk as alternate), Mr Konstantin Sadovnik (with Mr Marco Musetti as alternate) and Mr Max Goldman (with Mr Dimitri Gordin as alternate).

225.    These South African corporate registry records also reflect Mr. Pienaar's address, as accurately reported by Lexis:

| 1.  | Andre Daniel Fabre Pienaar |
|-----|----------------------------|
| 2.  | N/A |
| 3.  | British |
| 4.  | 5178142B4 |
| 5.  | 30/03/2017 |
| 6.  | Director |
| 7.  | Apartment 62, Sail Towers, Building 52, Road 38 Block 428, Al Seef District Mnanma, Bahrain |
| 8.  | Apartment 62, Sail Towers, Building 52, Road 38 Block 428, Al Seef District Mnanma, Bahrain |
| 9.  | Apartment 62, Sail Towers, Building 52, Road 38 Block 428, Al Seef District Mnanma, Bahrain |
| 10. | Director |

226.     Pienaar has repeatedly listed exactly that address in various C5 corporate registration documents.

227.     Further, upon information and belief, the "ID/Passport Number" referenced on the Lexis WinDeed record is Pienaar's true and accurate UK passport number.

228.     Most important, the bad faith upon which Pienaar and Glover accused Glueck of using "fake," "fraudulent," "fabricated" documents to show Pienaar's involvement with the UMK mine, starts and stops with one simple fact: Pienaar himself publicly admitted that he served on the Board of UMK. On YouTube.

229.     In 2018 Pienaar stated: "I know Viktor Vekselberg and I've met him on more than one occasion in different settings, and, as I shared with you, I served on the board of a South African mining company, which is black-owned for a period of a year, in which Renova had a minority investment alongside an Australian company called South32."[21]



---

[21] *See gen.* https://www.youtube.com/watch?v=20T6OGyhzv8&t=118s

230.    Glover and Pienaar's assertions at the October 2024 press conference that Pienaar's service on the UMK Board was based on a "fake document" were simply conjured out of thin air and are at odds with the overwhelming public record, including Pienaar's own words. Pienaar obviously knew he served on the Board of UMK at the time of the meeting yet proceeded with his defamatory tall tale. Thus, it wasn't necessary for the "fake document [to] tell[s] you that Andre is on the board of Vekselberg's mine." Pienaar said it himself.

231.    Pienaar has, in fact, had multiple business dealings and associations with Viktor Vekselberg, who is subject to U.S. sanctions,[22] as well as Vladimir Kuznetsov, Vekselberg's "right hand man."

232.    In 2015, C5 acquired a majority stake in Omada A/S, a Danish cybersecurity company, for $24 million.

233.    Documents show that Pienaar and Kuznetsov jointly owned C5 Razor Bidco Limited, a special purpose vehicle ("SPV") formed for the purpose of investing in Omada.

234.    In corporate records, Pienaar and Kuznetsov are both listed as directors of Omada, and both became directors on the same day.

235.    Further, upon information and belief, during Pienaar's time at G3, Pienaar worked to advance clients' interests in Russia and support oligarchs like Vekselberg, with Pienaar frequently touting his "high-level" sources at the Kremlin and in Russian intelligence. The legally questionable engagements were conducted under ominous code names such as Project Africa, Project Royal Academy, and Project Circe.

---

[22] The Department of the Treasury designation regarding Mr. Vekselberg is available at https://home.treasury.gov/news/press-releases/sm0338.

236.     And while being connected to Vekselberg may be an inconvenient truth for Pienaar, it was not fabricated by Glueck, nor did Glueck distribute falsified documents. Pienaar was included in the PowerPoint presentation because he, in fact, surreptitiously purchased stakes in SBD on four separate occasions, without disclosure, and while Donnelly was serving at the highest level of DoD. Pienaar is a foreign national with documented ties to a sanctioned Russian oligarch.

237.     Regardless, Pienaar knew, and Glover knew, or should have known, that Pienaar was on the Board of the UMK mine. They lied to journalists and accused Glueck of utilizing a fraudulent document asserting that simple fact.

## I.   The Assertion that Glueck Lied About Pienaar's Involvement in the Corrupt Transaction with Donnelly is False and Defamatory

238.     Pienaar's involvement in the transaction involving Donnelly also is factual and well-documented, as the PowerPoint details and as described herein.

239.     Despite the clear documentary and financial record, Pienaar and Glover repeatedly lied about the sale of Donnelly's firm, and his involvement in it.

240.     He told the assembled journalists that Donnelly "sold her interest in the business free and clear, before she went into government" and that she did so "with the DoD's knowledge." DoD's "knowledge" would be a remarkable feat since a year later he is quoted lying about the sale's basic facts: "I didn't buy Sally's firm."

241.     As described above, these statements are demonstrably untrue. The PowerPoint details the series of opaque, undisclosed, financial transactions about which Donnelly and Pienaar both made false statements. Defendants claimed that the PowerPoint was "based on documents that are fraudulent" and represent Glueck's effort to knowingly "spin up artificial narratives on people" and "use those narratives to destroy people."

242.   The only artificial narrative spun about the sale(s) of Donnelly's firm was the repeated denial by all parties involved that they had anything to do with it, or with each other.

243.   Pienaar told the journalists that Donnelly sold C5 her firm "free and clear", that the sale was disclosed and vetted, and posed no ethical or legal issue.

244.   If so, then why did SBD Advisors, Amazon and C5 each lie about the sale and its participants?

### 1. Amazon

245.   In December 2018, as public reporting about the possible connection between Donnelly (and her former firm now owned by Pienaar C5) and Amazon's DoD cloud sales, Amazon released a public statement.

246.   Amazon stated, "To be clear, neither C5 nor any of its subsidiaries are involved in AWS's JEDI bid. At no time, past or present, has Amazon or AWS ever invested in C5, its private equity fund, or any related portfolio companies. C5 has never been a teaming partner or subcontractor, nor lobbied on behalf of AWS in order for AWS to obtain government contracts."

247.   When Amazon released this 2018 statement, Amazon was under contract with C5 (SBD Advisors) to work "on behalf of AWS in order for AWS to obtain government contracts." An express deliverable of the Work Order is "favorable cloud sales procurement" decisions by DoD for AWS.

248.   That, in plain English, is exactly what Amazon denied they had hired C5 to do in its blog. Amazon said, "C5 has never … lobbied on behalf of AWS in order for AWS to obtain government contracts."  Categorically untrue.

### 2. Pienaar and C5 Capital

249.   Pienaar (through a spokesman) affirmatively lied about C5's involvement in Donnelly's 2017 sale of SBD Advisors.

250.     In June 2018, a C5 spokesman claimed that, "neither C5 Capital nor any of its venture capital funds or employees bought any shares from Sally Donnelly in January 2017 when she sold her interest in the firm before commencing public service." The statement continued, "Sally Donnelly did not receive any compensation from C5 or any of its portfolio companies while in government." And Pienaar himself stated, "I did not buy Sally's firm."

251.     Both those statements were plainly and objectively untrue. When C5 made those statements, Pienaar knew them to be false and made them to wrongfully hide his and C5's involvement in Donnelly's 2017 sale of SBD Advisors. He obviously knew VMAP, which he formed a day earlier, purchased SBD Advisors.

### 3.   SBD Advisors

252.     SBD Advisors also publicly, falsely denied the commercial relationship between Amazon and the purchaser of Donnelly's firm.

253.     Price Floyd, a principal at SBD Advisors, claimed in June 2018 that the purchaser of Donnelly's firm did not "have any commercial relationship with Amazon Web Services."

254.     This is likewise untrue. Pienaar and C5 have multiple overlapping commercial relationships with AWS.

255.     Despite Pienaar's assertion that Donnelly divested "free and clear," each party involved – Amazon, C5 and SBD Advisors – somehow found it necessary to lie about the most basic facts.

256.     A "conspiracy theory" is an explanation for an event or situation that attributes it to a secret plot by powerful, often sinister groups, even when other, more mainstream explanations are more likely. Here, the plain, straightforward explanations carry the day. Pienaar bought

Donnelly's firm and lied about it. Donnelly lied about it. And Amazon lied about it. Those lies are the only reason this remained controversial and unresolved. Glueck fabricated nothing.

### J. The Entire Press Meeting was Revisionist, False and Defamatory

257.    Apparently desperate to do anything to discredit the AP story except stand behind his defamation claims and testify under oath, Pienaar instead tried to convince the assembled journalists that the AP story was not the result of bona fide reporting, but rather an improper pretext to launder Glueck's defamatory "dossier."

258.    After premising the following outrageous claim with the proviso that it was "off the record", Glover told the journalists: "The AP article was purely a vehicle to run the dossier on Andre. That's all that article was." She added, "There's the AP article that ran based on fraudulent documents."

259.    Regardless, these statements on their own, and taken together with the rest of the presentation, are clearly meant to suggest that Glueck induced, or otherwise improperly influenced Suderman and the AP to print the article. This is absurd, especially given that Pienaar and Glover both know that Suderman and the AP stood behind their reporting in the face of a $10 million lawsuit against Suderman personally.

260.    The assertion that C5 has never advocated for Amazon sales, and that Glueck knowingly lied about the business ties among Pienaar, C5 and Amazon, is false and defamatory.

261.    As Defendants' press briefing wore on, their claims became increasingly desperate and incredible. Pienaar obviously knows that, in his role at C5, he assisted with what he called a "road show" meeting with foreign governments trying to "help drive AWS public sector cloud adoption" and "help drive AWS sales."

262.     He knows that C5 received hundreds of thousands of dollars from the Kingdom of Bahrain in connection with public sector cloud sales by Amazon to Bahrain. Amazon admitted as much stating, "in April of 2017, C5 became part of the AWS Partner Network (APN) Channel Reseller Program for one deal supporting the Bahrain Information and eGovernment Authority (iGA)." That AWS and C5 were commercial partners, and specifically that C5 has attempted to help AWS sell cloud around the world is beyond dispute.

263.     More importantly, Pienaar knows that he (through C5 entities) acquired Donnelly's firm SBD Advisors several times, including in 2017, 2018, and 2022. He knows that while he owned SBD Advisors, the firm was being paid by Amazon to advocate for "favorable cloud sales procurement" decisions by DoD while Donnelly was at DoD and owed money from Pienaar.

264.     This is the central thrust of the PowerPoint and it is obviously true as evidenced by the work order cited above, in all its detail.

265.     Indeed, in the internal ITC/C5 Board documents prepared in advance of the March 2018 acquisition of 51 percent of SBD, SBD's work for Amazon was detailed:



**Project SBD**

C5

Investors' Committee on 6th February 2018
(SBD - Request for Approval)

**Global Cloud Computing Provider**

Since 2016, SBD Advisors has assisted a global cloud service provider (CSP) seeking to increase its DoD sales revenue. SBD Advisors developed a stakeholder map outlining key target programs, senior DoD offices, executives, and outside influencers that were integral to the client's success. Subsequently, SBD Advisors enabled the client to meet-- and develop strategic relationships with--the identified stakeholders.

***Bottom Line:*** SBD Advisors helped the CSP build and execute an overarching strategy to accomplish its objectives, through stakeholder mapping of key influencers, tailored strategic messaging, and services as an information broker to senior DoD leaders.

266.     Pienaar's own due diligence documents therefore demonstrate Pienaar's knowledge of SBDs work for Amazon.

267.     Pienaar lied to the journalists and claimed that the PowerPoint's allegations about C5 being a commercial partner involved in AWS cloud sales efforts to governments, including the DoD, were false and based on fraudulent documents.

268.     He claimed that "C5 does not play any role anywhere in the world in selling Amazon AWS cloud services to governments or private [customers]." This was demonstrably false.

269.     Glueck did not spin up a false narrative about Pienaar, Donnelly, or Amazon—and has never done so about anyone else. Rather, Glueck presented significant and credible evidence that Pienaar was a participant in an influence peddling scheme, and that Donnelly and others acted improperly to rig an enormous DoD contract for Amazon.

270.     Defendants have acted with either actual knowledge of falsity or with reckless disregard for the truth or falsity of the defamatory statements they made to the journalists at the October 2024 meeting they convened. Pienaar himself has firsthand knowledge of his dealings with Russian oligarchs and his involvement in the Donnelly transactions that were part of the scheme to rig the JEDI contract for Amazon.

271.     Pienaar knows all too well that the facts in the PowerPoint presentations are true and that Glueck did not lie or engage in the character assassination of which Pienaar accuses him. Pienaar made his statements with actual malice.

272.     Upon information and belief, Glover also knew of the falsity of the statements that she and Pienaar made to the assembled journalists at the October 2024 meeting. At the very least, she acted recklessly and made these statements with reckless disregard for their truth.

273.  Upon information and belief, Pienaar and Glover made substantially the same statements on other occasions, to another group of journalists and to one or more journalists individually.

### K. The Defamatory Press Conference (and the Broader Campaign) Had Its Desired Effect

274.  In October 2024, the technology editor at Semafor reached out by email to Glueck. The editor explained that he had been told several things about Glueck. The editor repeated Pienaar's claim that a "dossier" contained knowingly false information and defamed Pienaar and that Pienaar only recently learned that Glueck had been the author of the presentation. The email reads:

> Hi Ken,
>
> I'm the technology editor at Semafor and I wanted to reach out for comment about some new information that I've reviewed regarding the "dossier" that was passed around during the contentious JEDI contract some years back. This is the one that alleged conflicts of interest between Amazon and the DoD.
>
> Earlier this year, in a legal proceeding brought by C5 Capital and Andre Pienaar, Stein Mitchell partner Robert Gilmore said that his firm received some of the source material for the dossier from Oracle, his client.
>
> Pienaar alleges that this statement confirms that Oracle was behind the dossier, which he claims includes false and defamatory information about him.
>
> Can you comment on the dossier and whether Oracle had anything to do with it?
>
> Pienaar also said that after the dossier first began circulating to journalists and lawmakers, he reached out to Oracle and spoke to representatives of the company about it. They denied that Oracle had anything to do with it at the time.
>
> I'd love to hear back from you on this and would welcome comments, on or off record. I'd need to hear back today or, at the latest, tomorrow morning.

275.  Thus, Pienaar and Glover were successful in their attempt to paint Glueck as a clandestine purveyor of fraudulent documents and knowingly false and defamatory "dossiers,"

including Pienaar's own fabrications. At no time did Pienaar "reach[ed] out to Oracle and spoke to representatives of the company about it. They denied that Oracle had anything to do with it at the time." That assertion is completely made up.

276.   In fact, Glueck happily provided an on the record statement to the Semafor editor. Glueck explained that he was not sure what a "dossier" is and added that the term appears to be purposefully salacious. He confirmed that he compiled information regarding Pienaar's involvement with Donnelly in connection with the JEDI bid.

277.   Glueck explained that he provided the information first and foremost to law enforcement, including the Department of Justice and that he stands by "every comma in everything we've ever said to law enforcement, lawmakers, and the media."

278.   Even the Semafor editor appeared caught off guard after being pitched by Pienaar/Glover and then speaking with Glueck. "Glueck's response was surprising. He said he'd been out in the open all along and stood by everything he had shared with reporters." Nothing clandestine here.

279.   What Glueck did not realize, but has since learned, is that the Semafor inquiry was caused by – and part of – a much broader campaign, followed shortly after by the October 30th press meeting. Pienaar and Glover's defamatory pitch nonetheless had its desired effect.

280.   Another direct consequence of Defendants' defamatory campaign was a Newsweek article published on October 10, 2024, in which Pienaar claimed that allegations regarding his connections with Russian oligarch Vekselberg "stem from a separate 2017 dossier which [Pienaar] called 'a wild conspiracy theory.'"

281.    Glueck is greatly distressed by the aggressive campaign and defamatory statements Defendants have leveled against him in front of respected members of the media, including Semafor and Newsweek.

282.    As a government relations professional for a leading technology company, Glueck relies on his reputation for honesty and trustworthiness in convincing those with whom he interacts to listen and take seriously the issues on which he advocates.

283.    If relevant actors in Congress, the Executive Branch, and the Press, come to believe that he is a liar and tries to destroy people through deceptive narratives, as Defendants falsely claim, then he will be ruined professionally and personally. Glueck already has suffered harm to his reputation and faces the prospect of further significant injury as a result of Defendants' slanders.

284.    As outlined above, Glueck did not create this controversy, nor did he perpetuate it. Glueck was not at the center of a corrupt transaction. Pienaar was the orchestrator. Glueck did not tell Pienaar, Donnelly, or Amazon to repeatedly lie and/or mislead the public and government officials. Glueck did not fabricate documents or use fraudulent documents. Pienaar's business associations are his business associations. Glueck did not violate both the FAR and JER, Amazon and Donnelly did. Glueck was blindsided and defamed at a private press briefing with a number of Washington's most influential journalists.

285.    For these reasons, Glueck has filed this action against Defendants to recover damages for the harm he has suffered from their defamatory actions.

# COUNT I
## DEFAMATION - SLANDER

286.     Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

287.     Defendants made false and defamatory statements of fact concerning Glueck to the assembled journalists present at the October 2024 meeting described herein.

288.     The false and defamatory statements of fact, described herein, asserted that Glueck used fraudulent documents as the basis for the slide deck; that Glueck falsely accused Pienaar of being involved in a corrupt transaction involving Sally Donnelly and Amazon for purposes of helping to procure the massive JEDI DoD contract for Amazon; that Glueck falsely accused Pienaar of being a malign bad actor associated with sanctioned Russian oligarchs; and that Glueck prepared and presented the supposed "dossier" as part of spinning a false narrative to destroy Pienaar and others.

289.     As described herein, each of these statements is false.

290.     Defendants made these false statements concerning Plaintiff knowing they were false and/or with reckless disregard for the truth or falsity of the statements.

291.     As a direct and proximate result of Defendants making the false statements concerning Plaintiff, as described herein, Plaintiff has suffered humiliation and mental anguish, damage to his reputation and professional business prospects and relationships, and other pecuniary damage.

292.     Upon information and belief, Defendants made these false and defamatory statements with the intent, or in reckless disregard of the prospect, that such statements would be disseminated throughout the world through articles published by one or more of the journalists.

58

No privilege protects Defendants from liability for their false and defamatory statements described herein.

293.    Upon information and belief, Defendants made these false and defamatory statements against Plaintiff with the specific intent of harming Plaintiff, boosting Pienaar's reputation, and furthering Defendants' own professional and personal interests, including to distract attention from Pienaar's IronNet related problems. Defendants' statements and actions show willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care, which raise the presumption of an intent to bring about, or conscious indifference to, the consequences of their making the false and defamatory statements, justifying an award of punitive damages.

## COUNT II
## FALSE LIGHT INVASION OF PRIVACY

294.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

295.    Defendants made false statements concerning Glueck to the assembled journalists present at the October 2024 meeting described herein.

296.    The false statements, described herein, state outright and also carry the unmistakable message that Glueck used fraudulent documents as the basis for the slide deck; that Glueck falsely accused Pienaar of being involved in a corrupt transaction involving Sally Donnelly and Amazon for purposes of helping to procure the massive JEDI DoD contract for Amazon; that Glueck falsely accused Pienaar of being a malign bad actor associated with sanctioned Russian oligarchs; and that Glueck prepared and presented the supposed "dossier" as part of spinning a false narrative to destroy Pienaar and others.

297.    As described herein, each of these statements is false.

298.    Such false statements place Glueck in a false light highly offensive to a reasonable person, such that anyone who listened to those statements when first made, or learns of those statements if repeated through other means (e.g., in articles written by the journalists present at the October 2024 meeting), understands the false statements to mean (either outright or by implication) that Glueck lied, used fraudulent documents, and has sought to destroy Pienaar by spinning a false narrative concerning Pienaar's activities.

299.    Defendants made these false statements concerning Glueck without any applicable privilege.

300.    Upon information and belief, Defendants made these false statements with the intent, or in reckless disregard of the prospect, that such statements would be disseminated throughout the world through articles published by one or more of the journalists at the meeting.

301.    Defendants made these false statements concerning Plaintiff (i) knowing they were false, and/or (ii) with reckless disregard for, or acting negligently concerning, the truth or falsity of the statements.

302.    As a direct and proximate result of Defendants making the false statements concerning Plaintiff, as described herein, Plaintiff has suffered humiliation and mental anguish, damage to his reputation and professional business prospects and relationships, and other pecuniary damage.

303.    Upon information and belief, Defendants made these false statements against Plaintiff with the specific intent of harming Plaintiff, boosting Pienaar's reputation, and furthering Defendants' own professional and personal interests, including to distract attention from Pienaar's, Donnelly's, and Amazon's misconduct with respect to the attempt to secure the JEDI contract, and

to impugn Glueck, who has been a persistent critic of Pienaar, Donnelly, and Amazon's misconduct concerning the JEDI contract.

304.    Defendants' statements and actions show willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care, which raise the presumption of an intent to bring about, or conscious indifference to, the consequences of their making the false statements, justifying an award of punitive damages.

### COUNT III
### CIVIL CONSPIRACY

305.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

306.    Pienaar and Glover conspired to make false and defamatory statements about Glueck to the journalists who they brought to the October 2024 meeting. Upon information and belief, Pienaar retained Glover and enlisted her aid in inviting the group of journalists and then communicating the falsities about Glueck that the two then presented at the meeting.

307.    Defendants agreed and acted in concert to arrange and conduct the meeting for one or more agreed upon unlawful purposes; namely, presenting false statements about Glueck and having the journalists propagate the falsities through their own writings or communications.

308.    Defendants each participated in the unlawful scheme through one or more unlawful acts; namely, jointly presenting, adopting, and endorsing each other's false and defamatory statements. At no point during the meeting did either Defendant disavow, recant, or express any disagreement or disapproval of, a statement made by the other Defendant. Thus, a statement by one Defendant was in effect made by both Defendants.

309.     As a direct and proximate cause of Defendants' overt unlawful acts, Plaintiff has suffered humiliation and mental anguish, damage to his reputation and professional business prospects and relationships, and other pecuniary damage.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

      a.      For general damages in an amount to be proven at trial;

      b.      For special damages in an amount to be proven at trial;

      c.      For punitive damages in an amount to be proven at trial, but not less than four times the amount of general and special damages combined, to punish Defendants and deter them from repeating their unlawful conduct;

      d.      For an injunction requiring Defendants to publish a retraction of all false and defamatory statements about Plaintiff;

      e.      For pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

      f.      For attorneys' fees and litigation costs incurred by Plaintiff in this action; and

      g.      For all other relief the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all of his claims against Defendants.

Dated: August 27, 2025        Respectfully submitted,

        */s/ Robert B. Gilmore*
        Robert B. Gilmore (DC Bar No. 492424)
        RGilmore@steinmitchell.com
        Philip J. O'Beirne (DC Bar No. 1032540)
        POBeirne@steinmitchell.com
        Kevin Attridge (DC Bar No. 1012349)
        kattridge@steinmitchell.com
        Megan Benevento (DC Bar No. 888229559)
        MBenevento@steinmitchell.com
        Samantha P. Christensen (DC Bar No. 1643399)
        SChristensen@steinmitchell.com
        STEIN MITCHELL BEATO & MISSNER LLP
        2000 K Street, N.W., Suite 600
        Washington, D.C. 20006
        (202) 737-7777 (telephone)
        (202) 296-8312 (fax)

        ***Counsel for Plaintiff***

# CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Kenneth Glueck | Andre Pienaar and Juleanna Glover |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888 | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT 99999 |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Robert Gilmore, Philip O'Beirne<br>Stein Mitchell Beato & Missner LLP<br>2000 K Street NW, Suite 600<br>Washington, DC 20006 (202) 737-7777 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ◉ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

- ○ **A.** *Antitrust*
  - ☐ 410 Antitrust

- ◉ **B.** *Personal Injury/ Malpractice*
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☒ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - ☐ 345 Marine Product Liability
  - ☐ 350 Motor Vehicle
  - ☐ 355 Motor Vehicle Product Liability
  - ☐ 360 Other Personal Injury
  - ☐ 362 Medical Malpractice
  - ☐ 365 Product Liability
  - ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
  - ☐ 368 Asbestos Product Liability

- ○ **C.** *Administrative Agency Review*
  - ☐ 151 Medicare Act

  **Social Security**
  - ☐ 861 HIA (1395ff)
  - ☐ 862 Black Lung (923)
  - ☐ 863 DIWC/DIWW (405(g))
  - ☐ 864 SSID Title XVI
  - ☐ 865 RSI (405(g))

  **Other Statutes**
  - ☐ 891 Agricultural Acts
  - ☐ 893 Environmental Matters
  - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ○ **D.** *Temporary Restraining Order/Preliminary Injunction*

  Any nature of suit from any category may be selected for this category of case assignment.

  ***(If Antitrust, then A governs)***

---

- ○ **E.** *General Civil (Other)* **OR** ○ **F.** *Pro Se General Civil*

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**Other Statutes**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 462 Naturalization Application

- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☑ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

---

**V. ORIGIN**

| ◉ 1 Original Proceeding | ○ 2 Removed from State Court | ○ 3 Remanded from Appellate Court | ○ 4 Reinstated or Reopened | ○ 5 Transferred from another district (specify) | ○ 6 Multi-district Litigation | ○ 7 Appeal to District Judge from Mag. Judge | ○ 8 Multi-district Litigation – Direct File |
|---|---|---|---|---|---|---|---|

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Defamation-Slander, false light invasion of privacy, civil conspiracy

---

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** to be determined<br>**JURY DEMAND:** | Check **YES** only if demanded in complaint<br>YES ☒   NO ☐ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form |
|---|---|---|---|

| DATE: _____ | SIGNATURE OF ATTORNEY OF RECORD _____   s/ Robert B. Gilmore |
|---|---|

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.**   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| Kenneth Glueck | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 1:25-cv-2899 |
| Andre Pienaar and Juleanna Glover | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Andre Pienaar
765 Tropical Circle
Sarasota, FL 34242

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Robert B. Gilmore/ Philip J. O'Beirne
Stein Mitchell Beato & Missner LLP
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 737-7777

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                    _____

                                             *Server's signature*


                                           _____

                                             *Printed name and title*


                                           _____

                                             *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Columbia

<table>
<tr><td>Kenneth Glueck</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><em>Plaintiff(s)</em></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No. 1:25-cv-2899</td></tr>
<tr><td>Andre Pienaar and Juleanna Glover</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><em>Defendant(s)</em></td><td>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Juleanna Glover
> 2146 Wyoming Avenue NW
> Washington, DC 20008

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Robert B. Gilmore/ Philip J. O'Beirne
> Stein Mitchell Beato & Missner LLP
> 2000 K Street NW, Suite 600
> Washington, DC 20006
> (202) 737-7777

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: