**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KENNETH GLUECK,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>ANDRE PIENAAR, et al.,<br><br>　　　　　　Defendants. | Case No. 1:25-cv-02899-ACR |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................. ii

INTRODUCTION ............................................................................................................................... 1

BACKGROUND .................................................................................................................................. 7

    A.  Factual Background ............................................................................................................. 7

    B.  Procedural Background....................................................................................................... 15

LEGAL STANDARD.......................................................................................................................... 16

ARGUMENT....................................................................................................................................... 18

    I.     The Court Lacks Subject Matter Jurisdiction Because 28 U.S.C. § 1332's Amount-in-Controversy Requirement Is Not Satisfied. ................................................ 18

    II.    The Defamation Claim Must Be Dismissed for Multiple Independent Reasons........... 21

        A.  The Challenged Statements Are Not "Of and Concerning" Plaintiff. .......................... 21

        B.  The Statements Are Not Capable of a Defamatory Meaning. ...................................... 28

        C.  The Statements Are Protected Opinion......................................................................... 31

        D.  Plaintiff Has Failed to Allege Actual Malice................................................................ 32

        E.  Plaintiff Has Failed to Allege Damages, and Cannot Rely on Defamation *Per Se*. ...... 35

    III.   The False Light Claim Must Be Dismissed. .................................................................... 37

    IV.   The Civil Conspiracy Claim Must Be Dismissed. .......................................................... 38

    V.    Any Claim for Punitive or Presumed Damages Must Be Dismissed............................ 40

    VI.   Defendants Are Entitled to Attorney's Fees and Costs. ................................................. 41

        A.  The D.C. Anti-SLAPP Act's Fee- Must Apply in Federal Court Because It Operates Independently of the Anti-SLAPP Act's Heightened Procedural Standards. ............... 41

        B.  D.C. Code § 16-5504 Is a Substantive Remedy that Must Apply in Federal Court When a Motion to Dismiss Is Granted Under Ordinary Federal Standards................. 43

CONCLUSION.................................................................................................................................... 44

CERTIFICATE OF SERVICE .......................................................................................................... 46

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ................................................................................42

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
    421 U.S. 240 (1975) ..............................................................................................43, 44

*Amazon Web Servs., Inc. v. United States*,
    147 Fed. Cl. 146 (2020) ...............................................................................................8

*Amazon Web Servs., Inc. v. United States*,
    153 Fed. Cl. 602 ( 2021) ..............................................................................................8

*In re Ex Parte Application of C5 Capital Ltd. & Andre' Pienaar*,
    No. 8:24-mc-45 (LKG) (D. Md. Jan. 29, 2024) ................................................11, 35

*Arpaio v. Zucker*,
    414 F. Supp. 3d 84 (D.D.C. 2019) .............................................................................33

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................16, 33

*Ayala v. Washington*,
    679 A.2d 1057 (D.C. 1996) ........................................................................................40

*Barrett v. Atl. Monthly Grp. LLC*,
    2024 WL 4119400 (D.D.C. Sept. 9, 2024) ..................................................................9

*Bauman v. Butowsky*,
    377 F. Supp. 3d 1 (D.D.C. 2019) .........................................................................30, 31

*\*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................................33

*Berk v. Choy*,
    607 U.S. 187 (2026) ...................................................................................................43

*Blodgett v. The Univ. Club*,
    930 A.2d 210 (D.C. 2007) ..........................................................................................37

*Bronner v. Duggan*,
    962 F.3d 596 (D.C. Cir. 2020) .......................................................................18, 19, 42

ii

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ..................................................................................26, 27, 37

*Burke v. Air Serv Int'l, Inc.*,
  685 F.3d 1102 (D.C. Cir. 2012) .................................................................................44

*Burlington N. R. Co. v. Woods*,
  480 U.S. 1 (1987)......................................................................................................43

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
  498 U.S. 533 (1991)..................................................................................................44

*BYD Co. Ltd. v. All. for Am. Mfg.*,
  2021 WL 1564445 (D.D.C. Apr. 21, 2021) ...............................................................20, 44

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)....................................................................................................43

*Coles v. Wash. Free Weekly, Inc.*,
  881 F. Supp. 26 (D.D.C. 1995)..................................................................................17

*Competitive Enter. Inst. v. Mann*,
  150 A.3d 1213 (D.C. 2016) .......................................................................................42

*Couch v. Verizon Commc'ns, Inc.*,
  2021 WL 4476698 (D.D.C. Sept. 30, 2021) ..............................................................33, 36

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017)...........................................................................21, 29

*Doe v. Predator Catchers, Inc.*,
  2023 WL 4107084 (M.D. Fla. June 21, 2023).............................................................21

*Donald J. Trump for President, Inc. v. WP Co. LLC*,
  2023 WL 1765193 (D.D.C. Feb. 3, 2023) ..................................................................33

*Est. of D.C. v. JP Morgan Chase Bank, NA*,
  No. 20-743 (TJK), 2023 WL 2571755 (D.D.C. Mar. 20, 2023)...................................19, 20

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
  749 A.2d 724 (D.C. 2000) .........................................................................................39

*Fairbanks v. Roller*,
  314 F. Supp. 3d 85 (D.D.C. 2018) .............................................................................31

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) ..................................................................................9, 17

iii

*Florio v. Gallaudet Univ.*,
    119 F.4th 67 (D.C. Cir. 2024)................................................................21

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974).......................................................................40

*Hindu Am. Found. v. Viswanath*,
    2022 WL 782389 (D.D.C. Mar. 15, 2022)....................................................20

*Indigenous People of Biafra v. Sheehan*,
    643 F. Supp. 3d 140 (D.D.C. 2022).......................................................20

*Jankovic v. Int'l Crisis Group*,
    494 F.3d 1080 (D.C. Cir. 2007)..........................................................28

*Jibril v. Mayorkas*,
    20 F.4th 804 (D.C. Cir. 2021)...........................................................34

*Kahal v. J.W. Wilson & Assocs., Inc.*,
    673 F.2d 547 (D.C. Cir. 1982)..........................................................20

*Kahl v. Bureau of Nat'l Affs., Inc.*,
    856 F.3d 106 (D.C. Cir. 2017)..........................................................32

*Kissi v. Panzer*,
    664 F. Supp. 2d 120 (D.D.C. 2009).......................................................39

*Klayman v. Segal*,
    783 A.2d 607 (D.C. 2001) ...........................................................21, 29

*KLEO AG v. Rivada Networks, Inc.*,
    148 F.4th 741 (D.C. Cir. 2025)....................................................21, 35, 36

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994)..........................................................17

*Lane v. Random House, Inc.*,
    985 F. Supp. 141 (D.D.C. 1995)......................................................32, 38

*Lawrence v. Renaissance Hotel Operating Co., Inc.*,
    2025 WL 2709853 (D.D.C. Sept. 23, 2025)................................................41

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003)........................................................35

*Mazur v. Szporer*,
    2004 WL 1944849 (D.D.C. June 1, 2004)................................................40

iv

*McFarlane v. Sheridan Square Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) ...................................................................35

*Merrill v. Palacios-Gomez*,
  2025 WL 1031985 (M.D. Fla. Mar. 3, 2025) ...........................................21

*Moldea v. New York Times Co.*,
  15 F.3d 1137 (D.C. Cir. 1994) .............................................................28, 37

*Moldea v. NewYork Times Co.*,
  22 F.3d 310 (D.C. Cir. 1994) ...................................................................31

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016) .........................................................31

*Nader v. Democratic Nat. Comm.*,
  567 F.3d 692 (D.C. Cir. 2009) .................................................................38

*Nepera Chem., Inc. v. Sea-Land Serv., Inc.*,
  794 F.2d 688 (D.C. Cir. 1986) .................................................................43

*Newman v. Howard Univ. Sch. of L.*,
  2024 WL 4227723 (D.D.C. Sep. 18, 2024) ...............................................36

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..................................................................................33

*Oracle Am., Inc. v. United States*,
  2019 WL 354705 (Fed. Cl. Jan. 23, 2019) .................................................9

*Oracle Am., Inc. v. United States*,
  975 F.3d 1279 (Fed. Cir. 2020)............................................................8, 36

*In re Order Pursuant to 28 U.S.C. § 1782*,
  No. 24-mc-10 (TNM) (D.D.C. Jan. 26, 2024) .........................................11

*Papasan v. Allain*,
  478 U.S. 265 (1986)..................................................................................17

*Pearce v. E.F. Hutton Group, Inc.*,
  664 F. Supp. 1490 (D.D.C. 1987) ............................................................40

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986)..................................................................................40

*Rosenboro v. Kim*,
  994 F.2d 13 (D.C. Cir. 1993) ...................................................................18

*Scahill v. District of Columbia*,
   909 F.3d 1177 (D.C. Cir. 2018) ...................................................................................17, 22

*Sculimbrene v. Reno*,
   158 F. Supp. 2d 8 (D.D.C. 2001) ...........................................................................................39

*Smith v. Clinton*,
   253 F. Supp. 3d 222 (D.D.C. 2017) .......................................................................................30

*Smith v. Clinton*,
   886 F.3d 122 (D.C. Cir. 2018) ...............................................................................................36

*Szymkowicz v. Frisch*,
   No. 19-cv-3329 (BAH), 2020 WL 4432240 (D.D.C. July 31, 2020) ...................19, 20, 21, 36

*Tah v. Global Witness Publ'g, Inc.*,
   991 F.3d 231 (D.C. Cir. 2021) .............................................................................33, 42, 43, 44

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ...............................................................................................28

*Usoyan v. Republic of Turkey*,
   2025 WL 2642134 (D.D.C. Sept. 15, 2025) ..........................................................................40

*Vindman v. Trump*,
   No. 22-257 (JEB), 2022 WL 16758575 (D.D.C. Nov. 8, 2022) .............................................17

*Walker v. Armco Steel Corp.*,
   446 U.S. 740 (1980) ..........................................................................................................43, 44

*Weyrich v. The New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ...........................................................................................31, 37

*Wu v. Inst. of Elec. & Elecs. Eng'rs, Inc.*,
   2024 WL 3995174 (D.N.J. Aug. 29, 2024) ............................................................................21

*Zimmerman v. Al Jazeera Am., LLC*,
   246 F. Supp. 3d 257 (D.D.C. 2017) .......................................................................................37

**Statutory Provisions and Rules**

*28 U.S.C. § 1332(a) ...................................................................................................................18

28 U.S.C. § 1782.........................................................................................................................11

Fed. R. Civ. P. 9(g) ....................................................................................................................35

Fed. R. Civ. P. 11.......................................................................................................................44

Fed. R. Civ. P. 12...................................................................................................17, 44

*Fed. R. Civ. P. 12(b)(6).................................................................16, 17, 33, 42

Fed. R. Civ. P. 12(f) ..............................................................................................4

Fed. R. Civ. P. 54(d)(2)........................................................................................44

D.C. Code § 16-5501(1)........................................................................................41

D.C. Code § 16-5502 ................................................................................41, 42, 44

D.C. Code § 16-5502(a)...........................................................................42, 43, 44

D.C. Code § 16-5502(b).................................................................................41, 42

D.C. Code § 16-5502(d)........................................................................................42

D.C. Code § 16-5504 ........................................................................41, 42, 43, 44

**Miscellaneous**

In re Oracle America, Inc., B-416657, B-416657.4 (Comp. Gen. Nov. 14, 2018),
    *available at* https://www.gao.gov/assets/b-416657%2Cb-416657.2%2Cb-
    416657.3%2Cb-416657.4.pdf;................................................................................9

Kate Conger and David E. Sanger, "Pentagon Cancels a Disputed $10 Billion
    Technology Contract" available at
    https://www.nytimes.com/2021/07/06/technology/JEDI-contract-
    cancelled.html .......................................................................................................8

"Dossier." Merriam-Webster.com Simple Definition, Merriam-Webster,
    https://www.merriam-webster.com/simple/dossier ...............................................28

**INTRODUCTION**

Without alleging a single cent's worth of concrete harm to himself, Plaintiff Kenneth Glueck has filed a 316-paragraph complaint (the "Amended Complaint" or "AC") alleging that Defendants Andre Pienaar and Juleanna Glover defamed him at a small meeting with journalists in October 2024. But rather than lay out specifically what Defendants said there—in its full context—and explain how it caused Mr. Glueck any harm, the Amended Complaint instead cherry-picks words and phrases, combines them with his own interpolations and paraphrases, and manufactures statements of Glueck's own making. Worse yet, the bulk of the Amended Complaint is consumed by allegations, insinuations, and innuendo about a $1.56 million transaction that took place almost ten years ago. And it is riddled with unrelated attacks on Mr. Pienaar's character, defamatory assertions about his conduct, and claims that Glueck would surely never make outside of court, where—as is not lost on anyone—his statements would not be shielded by any litigation privilege. The purportedly defamatory statements that Glueck alleges seem to be nothing more than a manufactured opportunity to attack Mr. Pienaar's reputation in public.

What are those purportedly defamatory statements? In short, the Amended Complaint tells the following story: Glueck (working in his capacity as a senior official at Oracle Corporation ("Oracle")) supervised the creation of a slide deck making claims about Mr. Pienaar. Years later, Mr. Pienaar and Ms. Glover stated that the slide deck was "based on" some source material that was "fraudulent" or "fake." Although one would not know this from reading the Amended Complaint, the record shows that Mr. Pienaar and Ms. Glover did not state that Glueck *knew* this, or that Glueck himself had any role in fabricating or procuring the "fraudulent" or "fake" source materials. Nevertheless, Glueck's defamation claim boils down to the allegation that Defendants defamed him by stating to a group of reporters that Glueck had helped compile and circulate a slide deck that, in turn, relied on false source material.

1

Even if they had been alleged accurately, such statements are not remotely actionable.  As set forth below, any one of several independent grounds for dismissal should allow this Court to make short work of Glueck's lengthy complaint.

The Amended Complaint tries to make things much more complicated.  In Glueck's mind, this case traces back all the way to 2017, when Oracle Corporation ("Oracle") and Amazon Web Services, Inc. ("Amazon") were competing bidders for the Department of Defense's "JEDI" cloud computing contract.  Neither one of them got it:  DoD first awarded it to Microsoft, but the contract was then cancelled after Amazon successfully sued to block its implementation, partly on the grounds that improper political influence had biased the process against Amazon.  Despite what actually happened, Glueck is apparently obsessed with the idea that the JEDI contracting process was biased in Amazon's *favor*, and that Mr. Pienaar was somehow involved.  How?  Well, the Amended Complaint alleges that Mr. Pienaar facilitated the sale of a former DoD official's consulting business so that she could enter government free of conflicts, but (the Amended Complaint alleges) she then steered the JEDI contracting process towards Amazon.

Mr. Pienaar has lived with these insinuations and false accusations of misconduct for a long time.  As the public record reflects—drawing from historical articles of which the Court can take judicial notice—as early as 2017, and while Oracle was mounting its own unsuccessful legal challenge to the JEDI award, reporters became aware that someone was circulating what they called a "dossier" casting aspersions on DoD's bidding process and leveling accusations of impropriety, including accusations involving Mr. Pienaar.  Unconfirmed rumors suggested that Oracle was behind this "dossier," but that was all.  Fast forward to 2024, and with the JEDI contract long since cancelled and replaced (with a multi-firm contract that includes Oracle, Amazon, *and* Microsoft), a reporter for *Semafor* published a story recounting the history of this "dossier" in

which Mr. Glueck—who is Oracle's chief in-house lobbyist—confirmed on the record that Oracle had compiled this document, although Glueck preferred to call it a PowerPoint presentation.

One week after that article's October 23, 2024 publication date, Mr. Pienaar—who had at that point been dealing with the "dossier's" conspiratorial accusations for seven years—spoke at a small gathering of reporters (the "October 30 Meeting") convened by Defendant Juleanna Glover, whom Mr. Pienaar had retained as a public relations consultant. Defendants explained some of the backstory relating to the "dossier" and noted that Glueck had recently acknowledged Oracle's responsibility for it, and Glueck's own role (as a senior Oracle official). Defendants stated that the "dossier" was based on source materials that were false, "fake," or "fraudulent," gave specific examples of what they were, and showed the assembled reporters the evidence supporting those assertions. There is no allegation that the statements made were then reported in any other public forum, or even that any of the assembled audience understood Defendants to be speaking about Glueck, as opposed to Oracle.

According to Glueck, those statements constituted actionable defamation against him. But Glueck fails utterly to explain how he was personally harmed by those statements. Instead, for all the outrage in his pleading, one gets the distinct impression that recovering compensation for his supposed injuries is not the point of this lawsuit. Instead, the Amended Complaint appears to be a manufactured excuse for an "oppo dump" on Mr. Pienaar—and worse. Indeed, Glueck appears suspiciously eager to use his pleading to trash Mr. Pienaar's reputation with accusations of unrelated wrongdoing and irrelevant attacks on his character.

For example, Glueck leaps at the opportunity to allege that Mr. Pienaar was the "orchestrator" of a "corrupt transaction," AC ¶ 291, and (tellingly) admits that his "central assertion" is that "Pienaar fraudulently acquired [a former DoD official's] firm on multiple

3

occasions," AC ¶ 196.    Other allegations in the Amended Complaint level accusations of impropriety having nothing to do with this case, including suggestions of impropriety surrounding Mr. Pienaar's own business, prior unrelated lawsuits filed against Mr. Pienaar, an unrelated bankruptcy involving one of his investments, and assertions that Mr. Pienaar has left other "aggrieved" counterparties "in his wake."  AC ¶¶ 52–55.  Perhaps most shockingly, Glueck even asserts that (in an unrelated business transaction) Mr. Pienaar was running a "Ponzi scheme" and trying to "raise funds from investors to prop [it] up," AC ¶ 19.  Those false accusations serve no purpose in this case other than to launder Glueck's attacks on Mr. Pienaar's reputation into public view, and in a forum where Glueck believes that the litigation privilege would shield him from liability.  The Court would be well within its rights to strike those allegations under Rule 12(f).

Regardless, this case has no place in federal court.  In fact, this Court lacks subject matter jurisdiction altogether, because Glueck has not made any concrete, non-conclusory allegations of harm.  Applying D.C. Circuit precedent, a growing consensus of courts in this District hold that a defamation claim lacking non-conclusory allegations of actual harm cannot meet the amount-in-controversy requirement for purposes of diversity jurisdiction, and further, that claims of presumed or punitive damages do not change that outcome.  This case falls squarely within that rule.  And the failure to allege actual damages would be fatal on the merits, even if the Court had jurisdiction, because the challenged statements were not defamatory *per se*.

Indeed, Glueck's claims fail on the merits many times over.  The Amended Complaint seeks to impose defamation liability on the basis of partial quotations and interpolated statements, attempting to give the impression that those hacked-up comments were words that Defendants said about Glueck.  As it turned out, Glueck never needed to attempt partial quotations, because he possessed an audio recording of the October 30 Meeting all along.  The Court and the public can

4

draw their own conclusions about why a plaintiff armed with an audio recording would need to allege purportedly defamatory statements through spliced quotations and paraphrases. Now that the recording is in the record, along with a certified transcript of that recording, it is evident that the statements alleged do not match what was actually said at the October 30 Meeting.

What Defendants actually said was not only not actionable, it was for the most part not even about Glueck. The few times Defendants mentioned Glueck, it was to repeat his own public acknowledgment of his role. Only by omitting words the Defendants actually used, and inserting words of his own, was Glueck able to give a contrary impression in his pleading. Glueck's claims therefore fail at the first element of defamation, because they are not "of and concerning" him.

Nor are the challenged statements capable of a defamatory meaning. At most, Defendants claimed that the slide deck that Glueck had publicly acknowledged he had helped compile and circulate was "based on" "fake" or "fraudulent" material. Defendants did not accuse Glueck of *procuring or fabricating* that material, only that the slide deck relied on it, in part. That assertion is simply not serious enough to be defamatory, much less defamatory per s*e*, which under D.C. Circuit precedent is reserved only for statements about "extreme subjects."

For similar reasons, the challenged statements are protected opinion. For example, Glueck complains about the use of terms like "dossier," or "clandestine," which he says connote improper or unlawful behavior. But those terms are classic opinion. Glueck may prefer the term "PowerPoint presentation" to "dossier," but under the First Amendment and black-letter defamation law, the difference between those two terms is not actionable. Defendants other statements amount to "loose" and "hyperbolic" language that is similarly not actionable.

Nor has Glueck carried his burden to allege actual malice. He is indisputably a limited-purpose public figure, having "thrust" himself into this particular controversy by (among other

5

things) commenting about it on the record to *Semafor*.  Accordingly, he must allege enough to make it plausible that he can prove by clear and convincing evidence that Defendants made the challenged statements with knowledge of their falsity, or at least reckless disregard.  The Amended Complaint fails to do so.  The most Glueck can muster is that Mr. Pienaar has first-hand knowledge of his own life, so he must have known that the challenged statements about the authenticity of certain documents were false.  But that simply does not follow:  Mr. Pienaar's understanding of his own personal history would not give him any reason to know whether a particular document stating a fact about him was authentic or fraudulent.  And the allegations of actual malice as to Ms. Glover are even weaker:  there is no allegation that Ms. Glover had any source for her statements other than Mr. Pienaar, and she had no reason to doubt that what she learned from him was true.

Finally, the tag-along claims for false light and civil conspiracy must also be dismissed.  It is well established that false light claims arising from the same facts as a defamation claim must meet the same fate.  And as to civil conspiracy, which is not an independent tort but a theory of vicarious liability, there is no allegation that Defendants ever agreed to do anything unlawful. Glueck would have the Court infer that because they worked together and agreed to attend the October 30 Meeting together, Defendants were co-conspirators.  But conspiracy liability requires a mutual understanding at the time of the alleged agreement that the agreement is for an unlawful purpose.  Absent any allegation that Ms. Glover had reason to doubt the veracity of Mr. Pienaar's information, Glueck cannot satisfy this element.

For any and all of these reasons, Glueck's claims must be dismissed.  And in light of recent D.C. Court of Appeals precedent, the Court must award Defendants their costs and attorney's fees under the D.C. Anti-SLAPP Statute.

## BACKGROUND

### A. Factual Background

Defendant Andre Pienaar is the founder and chief executive officer of C5 Capital Limited, an investment firm focused on cybersecurity, cloud infrastructure, and related sectors.  AC ¶ 51.  Defendant Juleanna Glover is the founder and chief executive officer of Ridgely Walsh, LLC, a Washington, D.C.–based public affairs and communications firm.  *Id*. ¶¶ 57–58.  She was retained by Mr. Pienaar "years after the JEDI procurement" was cancelled, and there is no allegation that she had any first-hand knowledge of those events. *Id*. ¶ 173.  Plaintiff Kenneth Glueck is Executive Vice President for Government Relations at Oracle Corporation, where he has been employed for nearly thirty years.  *Id*. ¶ 39.

### 1. The JEDI Contract

This case has its origins in Glueck's apparent obsession with proving that individuals purportedly aligned with Amazon's interests exerted improper influence over a Department of Defense ("DoD") procurement process that a) did not award the contract to Amazon and b) was ultimately canceled in its entirety.  As the Amended Complaint explains, DoD initiated the procurement process in 2017 for a sole-source cloud computing contract known as the Joint Enterprise Defense Infrastructure cloud, or "JEDI."  *Id*. ¶ 62.  Although the Amended Complaint asserts that the bidding process was "preordained" and that Amazon "was the intended recipient" because "the fix for Amazon was in," *id.* ¶¶ 60, 64, 65, one of the news articles cited for its truth in the Amended Complaint contradicts those insinuations right off the bat, explaining that

7

"Amazon was widely considered the front-runner" specifically "[b]ecause of the size and security requirements of the JEDI contract."[1]

Nevertheless, in October 2019, "following delays and high-profile disputes," DoD awarded the contract to Microsoft, not Amazon. *Id.* ¶ 66. As the Amended Complaint notes, Amazon disputed the award in court. *Id.* The Amended Complaint further asserts that Amazon "lost," but in fact Amazon obtained a post-award preliminary injunction blocking activities under the contract[2] and, in April 2021, defeated the government's (and Microsoft's) motion to dismiss Amazon's claim that improper political influence had infected the bidding process.[3] Nevertheless, Amazon (and other competing bidders) certainly "lost" in the sense that following Amazon's success in the litigation, the "JEDI procurement was ultimately cancelled in July 2021." *Id.*[4] Today, DoD relies instead on the Joint Warfighter Cloud Capability ("JWCC"), a "multi-cloud award" to "Google, Microsoft, Amazon, and Oracle" that replaced the JEDI contract. *Id.* ¶ 68.

Thus, the core of Glueck's insinuations about Mr. Pienaar's activities come down to the unsubstantiated claim that he was somehow involved in corruptly steering a DoD contract to Amazon even though 1) the contract was *actually* awarded to *Microsoft*, 2) Amazon filed a post-award protest that succeeded in part on the grounds that improper political bias might have steered the contract *away* from Amazon, and 3) the contract was cancelled, and replaced with a multi-cloud award including Amazon *and* Oracle *and* Microsoft. The strangeness of that story has not

---

[1] Kate Conger and David E. Sanger, "Pentagon Cancels a Disputed $10 Billion Technology Contract" available at https://www.nytimes.com/2021/07/06/technology/JEDI-contract-cancelled.html (cited at AC ¶ 66 n.10).

[2] *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146 (2020).

[3] *Amazon Web Servs., Inc. v. United States*, 153 Fed. Cl. 602 ( 2021).

[4] Oracle did file a pre-award protest and lost. *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1283 (Fed. Cir. 2020).

8

protected Mr. Pienaar from years of accusations that he was somehow involved in improperly steering a government contract somewhere it did not go.

## 2.  The 2018 Bloomberg Articles

On April 13, 2018, Bloomberg reported that "Oracle" was "leading a campaign in Washington to prevent Amazon[] from winning" the JEDI contract. Declaration of Aaron E. Nathan ("Nathan Decl."), Ex. 1.[5]  Simultaneously, Oracle was prosecuting a pre-award bid protest before the Government Accountability Office ("GAO") and, when that failed, in the Court of Federal Claims.[6]  On December 20, 2018—before the JEDI contract was awarded, but two weeks after Oracle had filed its protest in the Court of Claims after the unsuccessful conclusion of its GAO protest—Bloomberg published a story titled "Inside the Nasty Battle to Stop Amazon From Winning the Pentagon's Cloud Contract."  Nathan Decl., Ex. 2.  The article opened by advertising a "salacious dossier" and a "mystery client with an alias," and reported on the allegation that "Oracle" was "behind" an "anti-Amazon dossier circulating in Washington."  *Id*. at 1.[7]  That

---

[5] As is well established, whether or not they appear in the Amended Complaint, the Court "can take judicial notice of news articles for the existence or nature of the articles—and may do so without converting the motion to one for summary judgment," even though "it may not consider the articles for the truth of their assertions."  *Barrett v. Atl. Monthly Grp. LLC*, 2024 WL 4119400, at *7 (D.D.C. Sept. 9, 2024) (cleaned up); *see id.* (taking judicial notice of news articles where "[n]either party disputes that these articles were published," and noting that "news articles are a classic subject of judicial notice"); *see Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles.").  The articles and their contents are cited here for the facts of their existence and nature; to the extent the truth of any matters therein is discussed it is for background only and not because any legal issues presented by Defendants' motion to dismiss turn on those facts.

[6] *See In re Oracle America, Inc.*, B-416657; B-416657.2; B-416657.3; B-416657.4 (Comp. Gen. Nov. 14, 2018), *available at* https://www.gao.gov/assets/b-416657%2Cb-416657.2%2Cb-416657.3%2Cb-416657.4.pdf; *Oracle Am., Inc. v. United States*, 2019 WL 354705, at *1 (Fed. Cl. Jan. 23, 2019).

[7] Other news outlets had reported as early as August 20, 2018 that in "the past several months" preceding that date, "private investigative firm has been shopping around to Washington reporters a 100-plus-page dossier raising the specter of corruption on the part of senior Defense Department

"dossier," which Bloomberg had obtained, "relie[d] on photos, charts and public records in an attempt to portray a web of conflicts to cast doubt on the integrity of the cloud procurement." *Id.* The article reported that while the "dossier" did "contain certain accurate information regarding connections between industry executives and Defense Department officials," it "offer[ed] no real proof that those relationships corrupted the process." *Id.* at 2. Among the "dossier's" insinuations were the now-familiar allegations repeated in the Amended Complaint: it "implie[d] that Sally Donnelly, a top aide to Defense Secretary Jim Mattis, unfairly shaped the contract in favor of Amazon." *Id.* The Bloomberg article opined that "[s]ome of the allegations verge on the preposterous, suggesting, for example, that an Amazon executive's son's Facebook friendship with the entrepreneur who bought Donnelly's company constitutes evidence of corruption." *Id.* at 3. And the Bloomberg article reported—without naming Mr. Pienaar—that an individual matching his description was involved because he had a "romantic relationship" with "one of Amazon's . . . Washington executives" while a "C5 portfolio company bought Donnelly's company." *Id.* at 6.

The article reported that "Kenneth Glueck, the senior vice president who oversees Oracle's government relations in Washington, wouldn't respond to the allegation" that "Oracle" was "behind . . . the dossier." *Id.* at 2. And the Bloomberg article reported that although the "document was shopped around by RosettiStarr, a Bethesda, Maryland-based private investigations company," RosettiStarr had "declined to reveal who paid for the dossier's compilation" and didn't respond to Bloomberg's request for comment. *Id.* at 3.

### 3. The October 23, 2024 *Semafor* Article

On October 23, 2024, *Semafor* published an article titled "Return of the Jedi." Nathan Decl. Ex. 4. The article reported that although the "$10 billion Pentagon cloud computing plan

---

and private company officials in the cloud contract competition," although "at least some of the dossier's conclusions do not stand up to close scrutiny." Nathan Decl. Ex. 3 at 1.

10

known as Jedi fell apart years ago," "lawsuits and allegations" were still "swirling"—including, in "the latest example, a court deposition this summer that hasn't been previously reported," which "add[ed] new details to Oracle's efforts to discredit Amazon's bid." *Id.* at 2. The article reported that Mr. Pienaar had brought a "federal court proceeding"[8] and that in a deposition in that proceeding, "an attorney hired by Oracle"—a Stein Mitchell partner who testified under oath— "said that damaging accusations against Pienaar indeed originated with" Oracle. *Id.* The *Semafor* article reported Mr. Pienaar's "huge sense of relief that this has finally been admitted on the record in a form that is admissible evidence." *Id.* at 3.

The *Semafor* article was notable for another reason: for the first time, Glueck gave on-the-record comments acknowledging Oracle's role:

> Reached for comment, Oracle Senior Vice President Kenneth Glueck said he's never tried to hide the fact that the firm was building a case against Pienaar accusing the financier of dishonest business practices and having close ties to Russian oligarchs — allegations Pienaar denies.

*Id.* Glueck was quoted as saying: "We stand by every comma in everything we've ever said to law enforcement, lawmakers, and the media," and "said he instructed his attorneys to make sure to put on the record that Oracle was the source of the allegations against Pienaar." *Id.* The reporter expressed that "Glueck's response," that "he'd been out in the open all along and stood by everything he had shared with reporters," was "surprising." *Id.* at 5. And it was also "surprising that Oracle is still adding to the famous dossier after all these years." *Id.*

---

[8] This referred to petitions under 28 U.S.C. § 1782 that Mr. Pienaar had brought to obtain discovery in aid of a potential UK-based claim against a former employee of C5 Capital for defamation and breach of contract. *See* C5 Capital Ltd. & Andre Pienaar's Mem. of Law in Supp. of Their *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782, at 7-10, *In re Order Pursuant to 28 U.S.C. § 1782*, No. 24-mc-10 (TNM) (D.D.C. Jan. 26, 2024), ECF No. 1-1; *In re Ex Parte Application of C5 Capital Ltd. & Andre' Pienaar*, No. 8:24-mc-45 (LKG) (D. Md. Jan. 29, 2024).

11

Finally, Glueck admitted to circulating the PowerPoint presentations but disputed only the label of "dossier" because of the word's connotations.

> Glueck added that he never circulated a dossier, a word he said makes the effort sound salacious. Rather, he said he showed lawmakers, law enforcement and journalists PowerPoint presentations and provided documents to back up his case that Amazon had essentially rigged the bidding process. Glueck said he hired private investigators to conduct the research.

*Id.* at 3–4.

### 4. The October 30, 2024 Meeting.

Shortly after the *Semafor* Article was published, on October 30, 2024, Defendants hosted an invitation-only meeting for a small group of journalists at Ms. Glover's residence in Washington, D.C. AC ¶ 177.[9] The meeting lasted approximately one hour. *Id.* ¶ 16.

After introducing himself, Mr. Pienaar explained to the assembled journalists that "since 2017, I featured in a -- in a dossier that the Oracle Corporation has collated, primarily to target Amazon and Secretary Mattis." Tr. 2:17–19. Mr. Pienaar explained that "because I -- I had a little bit of history with one of the people who helped to collate the dossier," who Mr. Pienaar later explained was Rich Rosetti, he "began to feature very prominently in the dossier. And I'm sort of the opening chapter in this dossier that's been in circulation in Washington, D.C. since 2018 up until today, and that Mr. Glueck, the chief lobbyist for Oracle, has now acknowledged this -- he -- he's the author of and the owner of and -- and continues to disseminate." *Id.* at 3:2–11.

---

[9] A recording of the meeting obtained by Plaintiff has been deemed part of the record for purposes of this motion to dismiss. *See* Dkt. No. 33 (Joint Stipulation); April 21, 2026 Minute Order. The recording will be submitted to the Court in connection with delivery of courtesy copies once the motion is fully briefed, consistent with Your Honor's Individual Rules, or at an earlier time upon the Court's request. *See* Nathan Decl. ¶ 10; Nathan Decl. Ex. 5. Consistent with the Court's April 21 Minute Order, Defendants have also submitted a certified transcript of the recording, Nathan Decl. Ex. 6, which is cited herein as "Tr."

Ms. Glover then picked up the narrative, explaining that although "the dossier" had "been moving around for about seven or eight years," she and Mr. Pienaar

> did not know who . . . was moving [the] dossier previously until this summer. We've had suspicions, everybody sort of – it was an open secret that it was Oracle that was circulating this and had done the underlying research. Over the summer, one of the Oracle consultants was deposed, and they said on the record that they were paid by Oracle to build and circulate this material. The reason . . . that this is important is because it is -- the materials are based on documents that are fraudulent[.]

*Id.* at 3:13–4:3. Ms. Glover expressed her view that "this type of tactic" was something "we all are going to have to be very much aware of: the use of a -- private investigators to spin up sort of artificial narratives on people that go out and shop to media, and then proceeded to use, you know, those-- those narratives to destroy people." *Id.* at 4:7–13.

Mr. Pienaar then continued, explaining the history of the JEDI procurement process, and stating that "Oracle was one of the big technology companies who – who protested the . . . contract from the get-go," although "none of the material that's in this dossier was presented in their legal filings," *Id*. at 5:4–11. Continuing his reference to Oracle, Mr. Pienaar stated: "Whilst they pursued both a -- a protest to the Inspector General and litigated it to the highest court, they also pursued a clandestine campaign, which is largely based on the allegations in the dossier." *Id.* at 5:13–17.

Mr. Pienaar then continued to explain the history leading up to these events, until he came to a point in the narrative involving Viktor Vekselberg's acquisition of a South African mine. *Id.* at 15. At that point, Ms. Glover cut in again, showing the assembled reporters some documents: she explained that

> The thick document top is COR39, is a document that alleges that Andre is on the board of the mining company that Vekselberg o- -- owns in South Africa. All right? You have a second South African document, which is all of the directorship- -- it's a list of the directorships where Andre is actually involved in a business in South Africa. The AP reporting and all of the allegations in this dossier are based on this

13

439 document, which oddly doesn't have the correct ID number for this gentleman, who is a South African resident, nor does it spell his name incorrectly, nor does it use the correct address for his residence. And you have the real document and the fake document. You also have his first certificate, which we're not going to let you guys take with you, but that [inaudible] his -- of course, his -- his actual I- -- ID number. So dossier AP reporting based on fa- -- false documentation that are clearly provable to be false.

*Id.* at 15:17–16:15. A few minutes later, Ms. Glover repeated that "the AP article that ran based on . . . fraudulent documents." *Id.* at 22:12–14. And shortly after that, Ms. Glover referred again to the "fake document [that] tells you that Andre is on the board of Vekselberg's manganese company." *Id.* at 28:8–9.

Mr. Pienaar explained the South Africa-based events that led up to Rich Rosetti, "the founder of RosettiStarr," having a grudge against him. *Id*. at 34:10–13. Ms. Glover then interjected again to explain that this was "why this is so rich with South African detail, sort of bizarrely rich with detail, is because Rosetti . . . was the source for all of this, it is all sort of this intricate sort of bit of breadcrumbs that -- that are -- are laid out to appear to imply guilt of some sort, but are -- it's totally fabricated." *Id*. at 34:14–20. Ms. Glover encouraged Mr. Pienaar to explain how they "know RosettiStarr is working for Oracle," and Mr. Pienaar explained that he and his company had "recently deposed Stein Mitchell, which is a law firm . . . who's been working on this campaign throughout. And during the course of the deposition, they admitted that all the information that they've been taking around town comes from Oracle and RosettiStarr." *Id*. at 35:2–17. Mr. Pienaar then stated that these firms "have been working on this dossier for the last eight years, directly reporting to Ken Glueck, who is their chief lobbyist." *Id.* at 36:6–9. A reporter immediately asked what "Oracle's" "motive" was for doing that, and Ms. Glover said, "We should ask them." *Id.* at 36:10–12.

A few moments later, one of the reporters speculated that Oracle's behavior might be explained by there being "like, two or three people at this company, probably at a relatively senior

14

level, that's decided to devote resources to do this." *Id.* at 38:9–21. Ms. Glover said, "Well, we're not going to speculate," and Mr. Pienaar added that "There's one business name on the public record, which is Ken Glueck." *Id.* at 39:2–5. He continued: "And Ken has now come out openly and said, it's my dossier. I own it. I'm responsible for it. I'm the guy who funded this. I've taken it around for seven years and I'm going to continue to do so." *Id.* at 39:9–13. A reporter immediately commented, "But big picture, this is a commercial dispute between Amazon and Oracle," and Mr. Pienaar responded "Yes." *Id.* at 39:14–16.

Ms. Glover made two further comments relating to the authenticity of the documents on which the AP article was based, stating that the AP was "able to rely on fraudulent documents" due to the timing of litigation between Mr. Pienaar and an AP reporter, which prevented Mr. Pienaar from speaking to the AP—Ms. Glover hastened to clarify that "I'm not accusing the AP of anything." *Id.* at 48:18–49:1. Ms. Glover also stated that "the AP article was . . . purely a vehicle to run the dossier on Andre," but rather than attribute anything about the article to Glueck, she insinuated that Oracle was responsible, stating that "Oracle got a twofer" because the article also reflected poorly on another person associated with Amazon. *Id.* at 59:3–11.

### B. Procedural Background

On August 27, 2025, Plaintiff filed this action asserting claims for defamation, false light, and civil conspiracy based on the statements made at the October 30 Meeting. Dkt. No. 1. At a pre-motion conference on Defendants' anticipated motion to dismiss, the Court permitted Glueck to file an amended complaint clarifying the basis for his claims. Dec. 17, 2025 Minute Order. Glueck filed his Amended Complaint on January 5, 2026, asserting the same claims for defamation, false light, and civil conspiracy. AC ¶¶ 16–20, 173-8.

The Amended Complaint spins a long and involved narrative dating back to the JEDI procurement process and incorporating accusations and innuendo about Mr. Pienaar's conduct

15

wholly unrelated to Glueck's claims. Allegations of various purportedly false statements are scattered throughout, but the Amended Complaint avoids committing to a single, discrete set of allegedly defamatory statements.

The Amended Complaint does, however, attach an "Exhibit A" listing "Examples of Defamatory Statements." *See* Dkt. No. 22-1 ("Exhibit A"). Among other things, Exhibit A attributes to Glover statements referring to the materials at issue as a "dossier," asserting that certain materials were based on "fraudulent" documents, describing a PowerPoint presentation as "totally fabricated," and criticizing investigative tactics such as the alleged use of private investigators to develop media narratives. *Id*. The exhibit also attributes to Glover statements asserting that the Associated Press article concerning IronNet was "purely a vehicle to run the dossier" and that AP reporting relied on erroneous documents. *Id*. This Motion refers to the statements set out in Exhibit A as the "Challenged Statements."

Despite relying heavily on apparent verbatim quotations from the October 30 Meeting, Glueck's Amended Complaint did not attach or even mention a recording of that meeting. Instead, the Amended Complaint (as illustrated above and in Exhibit A) relied exclusively on partial, spliced quotations from what was presumably a record of that meeting in Glueck's possession (but otherwise nowhere to be found). Defendants challenged Glueck's right to manipulate the motion-to-dismiss record in that way, Dkt. No. 32, and on April 16, the parties agreed that the recording in Glueck's possession would be deemed part of the motion to dismiss record, and that Defendants would be permitted to attach a certified transcript of the recording to their motion to dismiss. Dkt. No. 33. The Court ordered that same relief. April 21, 2026 Minute Order.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

16

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[I]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah*, 736 F.3d at 534. The court is not "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor may it "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Further, a "court need not accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018).

As is well established, courts must "scrutinize" defamation claims "at an early stage" to protect against the "chilling" effect of lawsuits on the "exercise of First Amendment freedoms." *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995) (cleaned up). The D.C. Circuit "has observed that summary proceedings are essential in the First Amendment area because if a suit entails "long and expensive litigation", then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." *Farah*, 736 F.3d at 534. As one Judge in this District recently explained, "Rule 12 plays an especially important role in claims involving defamation," because "'the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits,'" *Vindman v. Trump*, No. 22-257 (JEB), 2022 WL 16758575, at *4 (D.D.C. Nov. 8, 2022) (cleaned up), and because "[e]arly resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive," *id.* (cleaned up).

17

## ARGUMENT

**I.    The Court Lacks Subject Matter Jurisdiction Because 28 U.S.C. § 1332's Amount-in-Controversy Requirement Is Not Satisfied.**

The Court lacks subject matter jurisdiction over this action.  Glueck invokes federal diversity jurisdiction, AC ¶ 35, which requires both complete diversity of citizenship and that "the matter in controversy exceed[] the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332(a).  "[T]he party asserting jurisdiction always bears the burden of establishing the amount in controversy once it has been put in question."  *Rosenboro v. Kim*, 994 F.2d 13, 17 (D.C. Cir. 1993).  Glueck has failed to carry his burden to allege the requisite amount in controversy.

The sum total of Glueck's damages allegations are as follows:

- "The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00)."  AC ¶ 35.

- "Glueck is greatly distressed by the aggressive campaign and defamatory statements Defendants have leveled against him in front of respected members of the media, including Semafor and Newsweek."  AC ¶ 288.

- "Glueck already has suffered harm to his reputation and faces the prospect of further significant injury as a result of Defendants' slanders."  AC ¶ 290.

- "As a direct and proximate result of Defendants making the false statements concerning Plaintiff, as described herein, Plaintiff has suffered humiliation and mental anguish, damage to his reputation and professional business prospects and relationships, and other pecuniary damage."  AC ¶¶  298, 309; *see id.* ¶ 316.

Those boilerplate, conclusory allegations of harm are insufficient to support a claim that Glueck has suffered more than $75,000 in damages. While a "plaintiff need not provide an exact valuation or detailed breakdown of damages at the outset of litigation, . . . it does not follow that any unsupported claim will suffice." *Bronner v. Duggan*, 962 F.3d 596, 610 (D.C. Cir. 2020).  Hence, "dismissal is warranted if, for example, the plaintiffs submit *no* evidence supporting their alleged injury," such as where plaintiffs provide "nothing beyond a bare-bones assertion of jurisdictional

sufficiency to suggest that the monetary damages arising from their . . . claims even remotely approach $75,000." *Id.* (cleaned up).

Following *Bronner*, a growing consensus of courts in this District have dismissed defamation claims that fail to allege any facts supporting a claim of actual harm—like this one. As discussed further below, Glueck alleges no facts to support his conclusory allegations that Defendants' statements harmed him. While that creates a basis to dismiss his claims on the merits, *infra* at 35-37, *Glueck*'s "fail[ure] to support his damages claims" with even minimal concrete allegations of harm also dooms his effort to satisfy the amount-in-controversy requirement. *Szymkowicz v. Frisch*, No. 19-cv-3329 (BAH), 2020 WL 4432240, at *7 (D.D.C. July 31, 2020).

Although Glueck also alleges that he is "greatly distressed," AC ¶ 288, and has suffered "mental anguish," AC ¶¶ 298, 309, 316, conclusory allegations of emotional harm cannot change this calculus. "A plaintiff hoping to use emotional harm as a ticket to federal court must 'explain *how* [it] has suffered' that harm." *Est. of D.C. v. JP Morgan Chase Bank, NA*, No. 20-743 (TJK), 2023 WL 2571755, at *2 (D.D.C. Mar. 20, 2023) (quoting *Szymkowicz*, 2020 WL 4432240, at *6). "A statement that the plaintiff has suffered emotional injury is a description only of the '*type*[ ] of harm,' and so does not meet the plaintiff's burden." *Id.* (quoting *Szymkowicz*, 2020 WL 4432240, at *6).

Further, as *Szymkowicz* holds, that conclusion is unaffected by the fact that a plaintiff who fails to allege any actual harm also alleges defamation *per se* and seeks presumed damages. "The mere invocation of presumed damages . . . is not enough to cross the jurisdictional threshold" because "presumed damages still serve a compensatory function," and therefore "may not be awarded in a substantial amount to a party who has not demonstrated evidence of concrete loss." *Szymkowicz*, 2020 WL 4432240, at *7 (cleaned up). Even where they are available, presumed

damages are not "a blank check," and "in fact a nominal recovery can be sufficient to vindicate injury to reputation." *Id.* Because even a successful plaintiff's "presumed damages must at least roughly approximate his actual harms," a plaintiff who has "failed to explain in any concrete terms how defendant's statements harmed him . . . also has failed to support his purported presumed damages in excess of $75,000." *Id.* at *8; *see id.* (citing similar cases in which presumed damages were awarded well below the $75,000 minimum).

Similarly, a plaintiff who has failed to allege actual harm cannot rely on a punitive damages claim to clear that $75,000 threshold. As is well established, punitive damages awards cannot exceed a constitutional maximum ratio of usually four but at most ten times actual damages. *Id.* at *9 (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)). Where a "plaintiff has shown only a *de minimis* amount of compensatory and presumed damages potentially at issue, . . ." the amount in controversy requirement is not met because "four—or, for that matter, ten—times a *de minimis* amount is still less than $75,000." *Id.* "Thus, even adding potential punitive damages to the calculus, plaintiff still falls short of satisfying the amount-in-controversy requirement." *Id.*; *see Kahal v. J.W. Wilson & Assocs., Inc.*, 673 F.2d 547, 549 (D.C. Cir. 1982) ("Liberal pleading rules are not a license for plaintiffs to shoehorn essentially local actions into federal court through extravagant or invalid punitive damage claims.").

Since *Szymkowicz*, courts in this District and elsewhere have coalesced around this very same conclusion: where a plaintiff fails to allege concrete facts supporting a claim of actual harm, the amount-in-controversy requirement is not satisfied, and claims for presumed and punitive damages do not change that. *See Est. of D.C.*, 2023 WL 2571755, at *2; *Indigenous People of Biafra v. Sheehan*, 643 F. Supp. 3d 140, 145–47 (D.D.C. 2022); *Hindu Am. Found. v. Viswanath*, 2022 WL 782389, at *2 (D.D.C. Mar. 15, 2022); *BYD Co. Ltd. v. All. for Am. Mfg.*, 2021 WL

20

1564445, at *4 (D.D.C. Apr. 21, 2021); *see also Merrill v. Palacios-Gomez*, 2025 WL 1031985, at *3 (M.D. Fla. Mar. 3, 2025), *report and recommendation adopted*, 2025 WL 913764 (M.D. Fla. Mar. 26, 2025); *Wu v. Inst. of Elec. & Elecs. Eng'rs, Inc.*, 2024 WL 3995174, at *5 (D.N.J. Aug. 29, 2024); *Doe v. Predator Catchers, Inc.*, 2023 WL 4107084, at *4 (M.D. Fla. June 21, 2023).

As in those cases, the Amended Complaint contains, at most, conclusory allegations about the "*type*[]" of harm suffered, rather than concrete allegations of "*how* he has suffered those harms." *Szymkowicz*, 2020 WL 4432240, at *6 (emphasis added) (cleaned up).  This case must be dismissed for lack of subject matter jurisdiction.

**II.     The Defamation Claim Must Be Dismissed for Multiple Independent Reasons.**

To state a defamation claim under D.C. law, a plaintiff must sufficiently allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence"—or, as in a public-figure case like this one, actual malice—"and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *KLEO AG v. Rivada Networks, Inc.*, 148 F.4th 741, 745 (D.C. Cir. 2025) (internal citations omitted). The Amended Complaint falls far short of sufficiently alleging these elements.

**A.  The Challenged Statements Are Not "Of and Concerning" Plaintiff.**

Glueck has failed to allege any defamatory statements that were "of and concerning" him. *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 144–45 (D.D.C. 2017); "To plausibly allege that the statements at issue concerned them, plaintiffs must show that a reasonable listener could think that the defendants were referring to them." *Florio v. Gallaudet Univ.*, 119 F.4th 67, 73 (D.C. Cir. 2024); *see Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) ("The publication must be

21

considered as a whole, in the sense it would be understood by the readers to whom it was addressed.") (cleaned up).

The Amended Complaint and Exhibit A are written to make it seem like the Challenged Statements referred to Glueck.  But that is not the case.  Comparing the statements as spliced in Glueck's pleadings with the statements as they appear in context tells a radically different story.[10] And now that it is in the record, the full context governs over Glueck's misleading descriptions. *See Scahill*, 909 F.3d at 1186 (a "court need not accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice").

For example, the Amended Complaint summarizes four supposedly "malicious lies that defamed Glueck":

> [1] Glueck based the PowerPoint that he had given to law enforcement on "fraudulent documents" and "false documentation that are clearly provable to be false."
>
> [2] Glueck's summary of the sale of Donnelly's firm was knowingly false and that Glueck had knowingly and wrongly accused Pienaar of being "involved in the corrupt transaction with Sally Donnelly."
>
> [3] Glueck had falsely seeded the portions of the AP article detailing Pienaar's prior relationships with a sanctioned Russian oligarch, and that Glueck had caused Pienaar to be labeled "a malign and bad actor that's associated with Russia" and that this claim was knowingly based on fraudulent documents; and
>
> [4] Glueck's modus operandi is to "spin up some artificial narratives on people," "shop those narratives to the media," and then "use those narratives to destroy people."

AC ¶ 197.  According to Glueck, "[t]aken together," these statements "point to a simple and straightforward conclusion:  that Glueck manufactured a false PowerPoint using fraudulent, 'fabricated' documents and knowingly provided it to various audiences to smear innocent people."

---

[10] In addition to a certified transcript of the recording, and as a visual aid for the Court, Defendants have also attached a version of that transcript highlighting the portions of the statements alleged in the Amended Complaint, so that they can be viewed in their true context.  Nathan Decl. Ex. 7.

AC ¶ 198.  But as one might suspect from the fact that the quoted language in paragraph 197 appears interspersed with Glueck's own paraphrase—and from the fact that Glueck's name does not appear in quotation marks *at all*—literally *none* of the quoted language, in context, actually refers to Glueck.

- Statement [1] is drawn from three places in the transcript where Ms. Glover is referring to an Associated Press article that, along with the "dossier," relied on information in documents that Ms. Glover stated were "false" or "fraudulent." Tr. at 15:16–16:15; *id.* at 22:6–23:13; *id.* at 48:13–49:5.  None of those sections of the transcript accuse Glueck of even being aware of the "false" or "fraudulent" nature of the documents—Ms. Glover's claim is that the *information* in the "dossier" is false, whether or not Glueck was aware that the sources for the dossier were faulty.

- Statement [2] paraphrases something Mr. Pienaar did not say (that "Glueck's summary of the sale of Donnelly's firm was knowingly false" and had "knowingly and wrongly accused" Mr. Pienaar of involvement in a "corrupt transaction").  Instead, the quoted language appears in a section of the transcript where Mr. Pienaar expressly refers to "two sets of allegations that *they've been pursuing for the last seven or eight years*," including "that I was involved in the corrupt transaction with Sally Donnelly." Tr. 6:10–19.  But the preceding context makes crystal clear that the "they" in that sentence refers to Oracle and RosettiStarr, not Glueck. Tr. 5:4–20.

- Similarly, Statement [3] conceals that the quoted language describes an accusation ("that I'm a malign and bad actor that's associated with Russia") comes from the same portion of the transcript, where Mr. Pienaar is attributing "two sets of allegations" to *Oracle and RosettiStarr*.  Tr. 6:21–22.

- Statement [4] invents a fictional statement about "Glueck's modus operandi" that was not made.  The quoted language appears where Ms. Glover is discussing *Oracle*'s role in disseminating the dossier, and then makes a general comment that "think this type of tactic, should Trump win, is going to be something that is – we all are going to have to be very much aware of:  the use of a -- private investigators to spin up sort of artificial narratives on people that go out and shop to media, and then proceeded to use, you know, those- those narratives to destroy people." Tr. 3:12–4:14.  Ms. Glover's expression of worry about the future was not a description of "Glueck's modus operandi."

Similarly, Exhibit A lists various composite "statements" that are, in fact, a mixture of out-of-context quotation with Glueck's own gloss.  Many of the statements listed in Exhibit A do not even refer to the dossier or have any discernible connection to Glueck's claims.  *See* Exhibit A at 4 (listing statements like Ms. Glover saying, "I think they like being known for going after people,

23

and I will say I've had some conversations with reporters and they tell me, 'What are you doing, Juleanna? You know these people. They'll come after you.' That's what they want.'").

Other "statements" in Exhibit A illustrate the discrepancy between Glueck's descriptions and what was actually said.  For example, Exhibit A states that Pienaar said that Plaintiff "pursued a clandestine campaign which is largely based on the allegations in the dossier."  Exhibit A at 1.  The transcript makes clear, however, that Pienaar was referring to Oracle, not Glueck.  *See* Tr. at 5:4–15 (describing the actions of Oracle and referring to "they pursued" a government protest, litigation, and "clandestine campaign").  Similarly, Exhibit A states that Glover "described Mr. Glueck's PowerPoint presentation" as "the use of a -- private investigators to spin up sort of artificial narratives on people that go out and shop to media, and then proceeded to use, you know, those -- those narratives to destroy people."  Exhibit A at 1.  But the transcript shows that Glover made no mention of Glueck (much less anything about any PowerPoint presentation) in or around this statement.  Rather, her statement about use of private investigators concerned a "type of tactic" that "we all are going to have to be very much aware of" if Trump wins the [2024] election.  *See* Tr. at 4:7–13.

In another example, Exhibit A states that Glover referred to Plaintiff's "PowerPoint" as "so rich with South African detail, bizarrely rich with detail.  It is all this intricate bit of breadcrumbs that are laid out to appear to imply guilt of some sort, but it's totally fabricated."  Exhibit A at 1.  Plaintiff's characterization of what Glover said is decidedly different from what she said in the meeting transcript.  There, Pienaar was talking about work he did years ago in South Africa that connected him to Rich Rosetti.  Glover then interjects, making no reference to Glueck or any PowerPoint:

> Which – it's also why this is so rich with South African detail, sort of bizarrely rich
> with detail, is because Rosetti -- Rosetti was the source for all of this, and it is all

> sort of this intricate sort of bit of breadcrumbs that -- that are -- are laid out to appear to imply guilt of some sort, but are -- it's totally fabricated.

Tr. at 34:14–20.  Plaintiff omits—without ellipses or any indication of alteration—critical portions of Glover's remarks in which she states that Rosetti was "the source of all of this."  That omission strips the statement of its context, obscuring the already tenuous attempt to link Plaintiff to Glover's separate comment that something was "totally fabricated."

Other examples illustrate that Glueck has no compunction about alleging statements that were never made.  Referring to the Associated Press article that included references to some of the allegations in the dossier, Glueck alleges that "They" (meaning Defendants) "attribute everything that the AP printed to Glueck."  AC ¶ 190.  Glueck's support for this allegation consists of the following (modified) quotations, which are also listed in Exhibit A as "examples of defamatory statements":

> a. "The AP article was purely a vehicle to run the dossier on Andre. That's all that article was."
>
> b. "The reason this is important" is because Glueck's PowerPoint, which they handed out, was "based on documents that are fraudulent."
>
> c. "There's the AP article that ran based on fraudulent documents."
>
> d. "This perfect set of circumstances lines up where the AP is able to rely on fraudulent documents."

*Id.*; *see* Exhibit A at 2, 3.  But as the transcript shows, *none* of these statements, in context, attribute the contents of the AP article to Glueck.  Tr. at 22:7–17; 48:13–49:5; 59:4–17.  Even where Glueck claims that Ms. Glover was stating that "Glueck's PowerPoint . . . was based on documents that are fraudulent," the transcript makes clear that Ms. Glover was attributing the "fraudulent" material to consultants that Oracle had hired.  *Id*. at 3:12–4:5 (Ms. Glover explaining that "one of the Oracle consultants was deposed, and they said on the record that they were paid by Oracle to build and

25

circulate *this material*. The reason is it's . . . that this is important is because . . . *the materials* are based on documents that are fraudulent") (emphases added).

The Amended Complaint is simply not a reliable source for what was actually said at the October 30 Meeting. And a review of the transcript of that meeting confirms that the statements that were actually made were not "of and concerning" Glueck.

At best, Glueck tries to make Defendants' statements about him through a roundabout theory: Defendants pointed to Glueck's own acknowledgement of having a supervisory role in creating the dossier as an Oracle official, and Defendants also claimed that the dossier was "based on" material that was "fake" or "fraudulent." AC ¶ 198. But that does not add up to a statement that *Glueck* procured or participated in the fabrication of false documents. *See Browning v. Clinton*, 292 F.3d 235, 247–48 (D.C. Cir. 2002) (where the defendant described a legal filing relying in part on a witness's testimony as a "web of deceit and distortions," "vicious and false," "no reasonable person would be able to infer that" the defendant "was accusing [the plaintiff] of deceitfulness, let alone perjury."). The most that Defendants said *about Glueck* was that he had a supervisory role in Oracle's efforts, and that Oracle's efforts relied in part on information that was false, without claiming that Oracle *knew* that they were false. That is plainly not defamatory.

Nor can Glueck fall back on an argument that the meeting "as a whole" made it appear to a reasonable listener that Defendants' various statements about the dossier were "concerning" him. The Amended Complaint itself contradicts any such argument, as its only allegation regarding how the audience understood the Challenged Statements confirms that they were understood to be *about Oracle*. The Amended Complaint alleges that the Challenged Statements had their "desired effect" when "the technology editor at Semafor reached out by email to Glueck." AC ¶ 281. According to the Amended Complaint, "The editor explained that he had been told several things about

26

Glueck.    The editor repeated Pienaar's claim that a 'dossier' contained knowingly false information and defamed Pienaar and that Pienaar only recently learned that Glueck had been the author of the presentation." *Id.*  But the Amended Complaint also quotes the full text of that email, which directly contradicts the Amended Complaint's description of that outreach.  Rather than indicating that the reporter "had been told several things *about Glueck*, the email says that

> Stein Mitchell partner Robert Gilmore said that his firm received some of the source material for the dossier from Oracle, his client.  Pienaar alleges that this statement confirms that Oracle was behind the dossier, which he claims includes false and defamatory information about him.  Can you comment on the dossier and whether Oracle had anything to do with it?

*Id.*  In other words, the journalist reached out to Glueck because of his role at Oracle, to ask questions *of Oracle*, *about* Oracle—not about Glueck.

There can be no serious dispute that Oracle was the focus of the meeting.  Pienaar opened the discussion by describing "a dossier that the Oracle Corporation has collated."  Tr. at 2:18.  Glover closed the meeting by emphasizing that "Oracle has said in the Semafor article last week that they stand by the dossier and they're going to keep doing what they're doing."  *Id*. at 63:18–20.   In between, Glover stated that Oracle was "circulating this [dossier] and had done the underlying research."  *Id*. at 3:18–19.  Pienaar explained that although "none of the material that's in this dossier was presented in [Oracle's] legal filings" concerning the JEDI contract, Oracle nonetheless "pursued a clandestine campaign, which is largely based on the allegations in the dossier," along with "a whole range of other measures that they took with the help of a private investigator firm based here in Washington, D.C. called RosettiStarr."  *Id*. at 5:9–20.

The discussion repeatedly returned to Oracle's role and motivations.  Glover asked directly, "And how do we know RosettiStarr is working for Oracle?"  *Id*. at 35:2–3.  Pienaar responded that Stein Mitchell "admitted that all the information that they've been taking around town comes from Oracle and RosettiStarr."  *Id*. at 35:15–17.  He then described Oracle's further pursuit of allegations

through "Republican senators and congressmen" and through the media, speculating that Oracle's actions were driven, at least in part, by its competition with Amazon over the JEDI contract. *Id*. at 37:8–21. Pienaar went on to question whether Oracle's conduct represented "a good use of Oracle's shareholder money." *Id*. at 38:9–10.

Meeting attendees framed the issue in the same way. They asked about Oracle's "motive" and "motivation," and one attendee observed, "But big picture, this is a commercial dispute between Amazon and Oracle," to which Pienaar responded, "Yes." *Id*. at 36:10; 39:14–16; 56:1. By contrast, when Defendants referred to Glueck, they did so only three times, and solely in his capacity as Oracle's "chief lobbyist," not as an independent actor, and without attributing to him any role in fabricating information, or any awareness of the falsity or fraudulent nature of any of the material on which the dossier was based. *See id*. at 3:8; 36:8–9; 39:5–9.

### B. The Statements Are Not Capable of a Defamatory Meaning.

"[T]he defamatory meaning inquiry focuses only on whether a reasonable reader could understand a statement as tending to injure a plaintiff's reputation." *Moldea v. New York Times Co.*, 15 F.3d 1137, 1142 (D.C. Cir. 1994) ("*Moldea I*"). Mere unpleasant or offensive language is insufficient; rather, the statement must make the plaintiff appear odious, infamous, or ridiculous. *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007). Whether a statement is reasonably capable of defamatory meaning is a question of law for the court. *Id.* In making that determination, the court must assess whether the challenged statement is "capable of bearing a particular meaning" and whether "that meaning is defamatory." *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. Cir. 1987).

The alleged statements on their face are not defamatory. For example, Defendants' statements about a "dossier"—used 14 times in Exhibit A—reflect no "odious, infamous, or ridiculous" meaning. The Amended Complaint calls the term a "sinister label." AC ¶ 27. That is

not what the word means. A dossier is simply "a group of papers that contain detailed information about someone or something," such as "the patient's medical dossier." Merriam-Webster, https://www.merriam-webster.com/simple/dossier. Thus, referring to Plaintiff's compilation of materials – more accurately, Oracle's compilation, *see* Tr. at 2:18—as a dossier does not support a claim for defamation.

The same is true for Glover's statement in Exhibit A about using a "private investigator to spin up artificial narratives on people that go out and shop to the media, and then proceeding to use those narratives to destroy people," as well as Pienaar's statement in Exhibit A referring to "a clandestine campaign which is largely based on the allegations in the dossier." Putting aside that neither statement was about Glueck, the statements are at most unpleasant or offensive, not defamatory. Other statements in Exhibit A likely conveyed the same neutral-to-unpleasant meaning, assuming they were even about Glueck. *See* Exhibit A at 1–3 (Pienaar stating: "He is the author of and owner of [the dossier] and continues to disseminate it." "They ran a campaign on the Hill, running around briefing, and in parallel with that, they went around law enforcement." Glover stating: "The AP article was purely a vehicle to run the dossier on Andre. That's all that article was." "I think they like being known for going after people...."). These statements do not invoke "hatred or loathing" for Glueck, do not bring him into "disgrace or dishonor," and do not subject him to "scornful laughter." *Klayman,* 783 A.2d at 618.

Nor are the alleged defamatory statements defamatory in their overall context. First and foremost, a defamation plaintiff is required to plead specific statements that meet the elements of defamation and cannot point to the gist of a meeting or conversation as a whole. *See Deripaska*, 282 F. Supp. 3d at 149 (holding that the plaintiff failed "to identify any single statement as false that is both capable of verification and capable of defamatory meaning. Reformulating his

29

arguments to infer defamatory meaning from the article as a whole does not cure this deficiency and so the Court must dismiss the complaint as a matter of law.").

Further, in context, Defendants' statements were denials or rebuttals of others' allegations, not defamatory attacks on Glueck. *See Bauman v. Butowsky*, 377 F. Supp. 3d 1, 14 (D.D.C. 2019) (citing cases). In *Bauman*, the defendant had asserted that the plaintiff was a "Democrat crisis management person" whose role was to "discredit and try to go after people," and was "simply a hired guy who will say anything" who "should apologize to the country for crafting a lie." *Id.* at 5. In particular, the Court held that the statement about "crafting a lie" was non-actionable because it arose not as a standalone accusation against a private individual, but as "the latest reprisal in a charged, back-and-forth public exchange" between Bauman and Butowsky. *Id.* at 14. And the description of Bauman as a "Democrat crisis management" figure was not defamatory at all in light of Bauman's admitted role as a public relations specialist for Democratic causes—and, if anything, "could be easily viewed by many as a badge of honor." *Id.* at 15. In sum, the plaintiff failed to allege that the defendant had "intended, or affirmatively endorsed," a defamatory implication about him. *Id.*

The same reasoning applies here. Defendants never accused Glueck of lying. Although they stated that certain dossier materials and an AP article were *based on* fake or fraudulent documents, they did not say that the dossier or article themselves were fake, nor did they assert that Plaintiff created, knew of, or was responsible for false documents. Plaintiff likewise fails to allege facts showing that Defendants intended to imply that Plaintiff was responsible for fabricating documents. *See id*. at 15. A statement that other people's views are "wrong" or based on an inaccurate understanding of the facts does not imply that the proponent of those materials was lying. *See Smith v. Clinton*, 253 F. Supp. 3d 222, 241 (D.D.C. 2017). Moreover, when viewed

30

in context—addressing Oracle's involvement in prior allegations concerning Pienaar and others—Defendants' denials and critiques of supporting documents during a meeting with journalists amounted to a non-actionable "charged, back-and-forth public exchange" over a matter of public controversy. *Bauman*, 377 F. Supp. 3d at 14.

### C. The Statements Are Protected Opinion.

The Challenged Statements are replete with protected opinion. For a statement to constitute actionable defamation, it must "at a minimum express or imply a verifiably false fact[.]" *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id*. (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)). Further, "'loose, figurative, or hyperbolic statements generally are not actionable in defamation." *Moldea v. New York Times Co*., 22 F.3d 310, 313 n.2 (D.C. Cir. 1994) ("*Moldea II*") (citations omitted). Courts in this jurisdiction have consistently held that "[w]here the question of truth or falsity is a close one, a court should err on the side of nonactionability." *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 92 (D.D.C. 2018) (citing *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988)). Whether a statement asserts or implies actionable facts is a question of law. *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247–48 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017). A court must consider not only the words used but their context "because it is in part the settings of the statement that makes its hyperbolic nature apparent." *Id*. at 248 (citing *Moldea II*, 22 F.3d at 314).

Words and phrases to which Glueck ascribes talismanic defamatory meaning—like "dossier," "clandestine campaign," "spinning up" "artificial narratives" in an effort to "destroy people" and stir "controversy"— are textbook examples of "'loose, figurative, or hyperbolic statements" that constitute protected opinion. *Moldea II*, 22 F.3d at 313 n.2.

31

Importantly, even the alleged statements that certain materials underlying the dossier were "fake," "fraudulent," or "fabricated" are protected opinion. Except for a single South African mining document, Defendants' statements about dossier materials and an AP article being *based on* false documents were made generically. Those statements were, in context, descriptions of Defendants' views of the quality of the information on which the dossier was based, not factual contentions about specific documents capable of being true or false. And the contention that the particular document showing Mr. Pienaar to have served on the board of a South African mine was "fake," "false" or "fraudulent"—words attributed to the *document*, not to Glueck—were still protected opinion. And because Defendants accompanied those statements by sharing supporting evidence of their own, AC ¶¶ 225, 230, the audience was "free to draw his or her own conclusions based upon those facts," making the statements protected by the common-law fair comment privilege as well. *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995) ("[T]he inclusion of the underlying facts," where a publisher printed the plaintiff's statement and added the claim that the statement made the plaintiff "guilty of misleading the American public" "more than complie[d] with this circuit's criteria for applying the fair comment privilege.").

### D. Plaintiff Has Failed to Allege Actual Malice.

Glueck has also failed to allege actual malice, which is fatal to his claims as a limited-purpose public figure. Limited-purpose public figures "are those who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017) (internal quotations omitted) (cleaned up). Whether Glueck qualifies as a limited-purpose public figure is a "matter of law for the Court to decide." *Id.* (cleaned up). The Amended Complaint establishes that Glueck actively sought to influence the public on this controversy, including Pienaar and others' alleged involvement. *See* AC ¶¶ 60, 147-59. And Glueck unquestionably "thrust" himself

into the public controversy about the propagation of the dossier, voluntarily speaking on the record to *Semafor*, taking credit for the dossier, and affirming that Oracle stood by every word of it. *Supra* at 11. As such, Plaintiff must plead actual malice—knowledge of falsity or reckless disregard—to survive a motion to dismiss. *See NewYork Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).

> To plead actual malice:
>
> [T]he plaintiff must show, by clear and convincing evidence, that when the defendants published the allegedly defamatory statements, they were subjectively aware that it was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that defendant has obvious reasons to doubt.

*Couch v. Verizon Commc'ns, Inc.*, 2021 WL 4476698, at *3 (D.D.C. Sept. 30, 2021). The actual malice standard is "famously daunting" and governed by a subjective standard: "The speaker's failure to meet an objective standard of reasonableness is insufficient; rather the speaker must have actually harbored subjective doubt." *Tah v. Global Witness Publ'g, Inc.,* 991 F.3d 231, 240 (D.C. Cir. 2021) (cleaned up). Where a complaint contains insufficient allegations of actual malice, it must be dismissed at the Rule 12(b)(6) stage. *See, e.g.*, *id.*; *Donald J. Trump for President, Inc. v. WP Co. LLC*, 2023 WL 1765193, at *4 (D.D.C. Feb. 3, 2023).

Plaintiff here pleads only formulaic, conclusory language that Defendants knew or recklessly disregarded the truth of their statements. *See Twombly*, 550 U.S. at 555 (a complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do"). For example, Plaintiff asserts at Paragraph 199 of the Amended Complaint that "[e]ach of these assertions about Glueck are demonstrably false. And Defendants either knew, or recklessly disregarded, that they are false." AC ¶ 199. The preceding paragraphs describe what Defendants said about Glueck, albeit inaccurately, but they do not include any facts showing, directly or by inference, that Defendants made false statements knowingly or with reckless

33

disregard for the truth. *See Arpaio v. Zucker*, 414 F. Supp. 3d 84, 91 (D.D.C. 2019) (threadbare recital of the definition of actual malice cannot satisfy *Iqbal*).

Elsewhere, Glueck alleges that Pienaar must have known his allegations were false because he "himself has firsthand knowledge of his dealings with Russian oligarchs and his involvement in the Donnelly transactions." AC ¶ 277. But that allegation is circular and proves far too much: Glueck's theory is that because he has alleged that something Mr. Pienaar said was false, and Mr. Pienaar's statement involved matters of which he has firsthand knowledge, Mr. Pienaar must have known that his statement was false. If that were enough to create a plausible inference of knowledge of falsity, it would establish malice in virtually every case. And in any event, Glueck has alleged *nothing* to suggest that Defendants' specific claim—that the dossier was "based on" documents that were "fraudulent" or "fake"—was something Mr. Pienaar believed to be false.

Finally, even if Glueck could allege actual malice as to Mr. Pienaar, he certainly cannot as to Ms. Glover. Glueck's only allegation as to Ms. Glover's state of mind is made "[u]pon information and belief,"[11] and it is conclusory: that "Glover also knew of the falsity of the statements that she and Pienaar made to the assembled journalists" or at least acted "with reckless disregard." AC ¶ 279. But the Amended Complaint provides no allegations to support those "information and belief" allegations. And it *does* allege that Ms. Glover was retained by Mr. Pienaar "years after the JEDI procurement" was cancelled—there is no allegation that she had any first-hand knowledge of those events. AC ¶ 173. Because Glueck's only allegations as to Mr.

---

[11] Glueck's resort to "information and belief" pleading, in addition to constituting an admission that he lacks direct allegations as to Ms. Glover's state of mind, is an independent basis to reject these allegations. Even where "pleadings on information and belief are permitted," because "the necessary information lies within defendants' control," the D.C. Circuit "also require[s] that the allegations based on information and belief be accompanied by a statement of the facts upon which the allegations are based," something that is nowhere to be found here. *Jibril v. Mayorkas*, 20 F.4th 804, 816 (D.C. Cir. 2021) (cleaned up).

Pienaar's alleged actual malice trace to Mr. Pienaar's first-hand knowledge of his own experiences, there is not (and could not be) any allegation that Ms. Glover had relied on any source other than Mr. Pienaar for what Mr. Pienaar knew from his own first-hand knowledge. In turn, because any inference of actual malice "must be drawn solely on the basis of information available to and considered by the defendant before publication," the fact that Ms. Glover's only information about Mr. Pienaar's first-hand experience came *from Mr. Pienaar* defeats any claim of malice as to her. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) (cleaned up). Even if Glueck had alleged that Mr. Pienaar's account was unreliable, that would not be enough, because a plaintiff must allege that "even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt."  *Id.*  A defendant does not need to secure independent verification of a source's claims, or credit the plaintiff's denial, to overcome allegations of actual malice.  *Id.*; *see Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) (allegations that a defendant acted "on the basis of a biased source and incomplete information does not demonstrate with clear and convincing evidence that the defendant[s] realized that [their] statement was false or that [they] subjectively entertained serious doubts as to the truth of [their] statement") (cleaned up).  Ms. Glover cannot have acted with actual malice.

### E.  Plaintiff Has Failed to Allege Damages, and Cannot Rely on Defamation *Per Se*.

To survive a motion to dismiss, a defamation plaintiff must sufficiently allege either that the challenged statements were "actionable as a matter of law irrespective of special harm"—*i.e.*, that they were defamatory "per se"—or that their "publication caused the plaintiff special harm." *KLEO AG*, 148 F.4th at 745. "Special harm," or "special damages," is "a term that refers to actual pecuniary loss."  *Id.* (citations and internal quotations omitted). "Under Federal Rule of Civil Procedure 9(g), special damages 'must be specifically stated.'"  *Id.* (quoting Fed. R. Civ. P. 9(g)).

35

The Amended Complaint is devoid of any allegations that the Challenged Statements caused special damages amounting to "actual pecuniary loss." Indeed, Plaintiff's allegations of damages are entirely conclusory. *See supra* at 18-21. Thus, the Amended Complaint can survive dismissal only if it alleges statements that are defamatory per se. It does not.

"Only 'statements about extreme subjects' are considered defamatory per se." *KLEO AG*, 148 F.4th at 746. Generally, "defamation per se occur[s] only where a defendant has falsely accused the plaintiff of committing a crime or other unlawful act." *Couch*, 2021 WL 4476698, at *5. And the mere fact that a statement accuses someone of dishonesty—like the purported statements at issue here—is insufficient, because "even if [a defendant's] statements could be understood as casting [the plaintiffs] as liars, this unpleasant portrayal does not amount to defamation per se." *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018). Thus, even if the other elements of defamation were satisfied, Plaintiff's defamation claim must fail because he has not alleged any statement that is so "extreme" to be defamatory *per se*. In short, "[d]efamation law is not a general-purpose right to sue when people [allegedly] tell lies." *Newman v. Howard Univ. Sch. of L.*, 2024 WL 4227723, at *13 (D.D.C. Sep. 18, 2024). Because Plaintiff has done nothing more than that, his defamation claim must be dismissed. Further, to the extent that Glueck *has* alleged statements that could qualify as defamatory *per se*, presumed damages awarded on such a theory would still have to "at least roughly approximate his actual harms," *Szymkowicz*, 2020 WL 4432240, at *8, and Glueck has alleged no actual harm. *Supra* at 18-21.

Finally, the Amended Complaint fails to allege facts suggesting that Defendants *caused* any such harm. Defendants spoke off the record, and there is no allegation that the reporters assembled at the October 30 Meeting ever published stories based on the statements made there. To the contrary, the only specific allegations regarding the spread of the Challenged Statements

36

beyond the audience at the October 30 Meeting is an allegation that a reporter reached out to Glueck to ask about statements that had been made about *Oracle*. *Supra* at 26-27. And, bizarrely, the Amended Complaint also alleges that "[a]nother direct consequence of Defendants' defamatory campaign was a Newsweek article published on October 10, 2024," approximately three weeks *before* the Challenged Statements were made. AC ¶ 287. But other than that, there is no allegation that the Challenged Statements ever reached an audience beyond the small group of journalists who heard them—*until Glueck filed this case*. There is little doubt that Glueck's own filing did more to publicize Defendants' statements than anything Defendants have done.

### III.    The False Light Claim Must Be Dismissed.

The false light claim must be dismissed for the same reason as the defamation claim. *See, e.g.*, *Blodgett v. The Univ. Club*, 930 A.2d 210, 223 (D.C. 2007) ("where the plaintiff rests both his defamation and false light claims on the same allegations, as [plaintiff] has done here, the claims will be analyzed in the same manner"); *Browning v. Clinton*, 292 F.3d 235, 248 (D.C. Cir. 2002) (affirming the dismissal of a false light claim because it "rests on the same facts as [plaintiff's] defamation claim"); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 274 (D.D.C. 2017) ("[C]ourts often analyze the two claims in the same manner, particularly where a plaintiff rests both claims on the same underlying allegations."). Although the two torts are "distinct," "the same First Amendment protections apply," *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001). Thus, "a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light." *Moldea I,* 15 F.3d at 1151. The Court must therefore dismiss the false light claim for the same reasons given above. And to the extent Plaintiff attempts to plead the two torts "in the alternative," *id.*, Plaintiff has alleged no facts that would independently satisfy the requirements of a false light claim. *Id.*; *see Weyrich*, 235 F.3d at 628 ("To prevail on a false light claim under District of Columbia law, appellant must show

that (a) the published material places appellant in a false light which would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.") (cleaned up).  Apart from the flaws common to his defamation claim, Glueck cannot meet the "highly offensive to a reasonable person" standard.  "It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in [a plaintiff's] position."  Restatement (Second) of Torts § 652E, cmt. c (1977).  Any attempt to satisfy that standard would be rendered implausible by Glueck's own comfort in making accusations about Mr. Pienaar, including in the Amended Complaint.  *Supra* at 3-4; *see Lane*, 985 F. Supp. at 149 ("It is quite simply untenable that someone espousing Lane's views would take umbrage at the rather reserved assessment that he misled the American public.  Under Lane's lopsided rules of engagement, he gets his choice of weaponry and tactics; Random House must do battle unarmed and march openly in a straight line. A conspiracy theory warrior outfitted with Lane's acerbic tongue and pen should not expect immunity from an occasional, constrained chastisement.").

## IV.    The Civil Conspiracy Claim Must Be Dismissed.

The civil conspiracy claim must also be dismissed.  "Under District of Columbia law, civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort.  A claim for civil conspiracy thus fails unless the elements of the underlying tort are satisfied."  *Nader v. Democratic Nat. Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (cleaned up).  Because the defamation and false light claims must be dismissed, the civil claim must be as well.

The civil conspiracy claim would also fail as a theory of vicarious liability even if any underlying tort had been alleged. Under D.C. law, "The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in

38

an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000).

Plaintiff has not alleged any "agreement . . . to participate in an unlawful act, or in a lawful act in an unlawful manner." *Id.* Because a plaintiff "must allege a 'meeting of the minds' as to some improper purpose" to satisfy that element, the alleged agreement must include a mutual understanding of its unlawful objective. *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 16 (D.D.C. 2001) (cleaned up); *see Kissi v. Panzer*, 664 F. Supp. 2d 120, 127 (D.D.C. 2009) (dismissing a conspiracy claim because the plaintiff failed to "allege the existence of an agreement among the defendants to engage in an unlawful act or an overt act done pursuant to and in furtherance of their common scheme"). Here, Glueck alleges that "Defendants agreed and acted in concert to arrange and conduct the meeting for one or more agreed upon unlawful purposes; namely, presenting false statements about Glueck and having the journalists propagate the falsities through their own writings or communications." AC ¶ 314. Such a conclusory allegation is insufficient. *Kissi*, 664 F. Supp. 2d at 127. But it fails for a further reason, which is that the Amended Complaint contains no non-conclusory allegation that Ms. Glover was aware of the alleged falsity of Defendants' statements. *Supra* at 34-35. Absent such knowledge, there can have been no agreement to participate in an *unlawful* common scheme. Thus, once Ms. Glover is dismissed from this action on actual malice grounds, she cannot be hauled back in on Glueck's conclusory conspiracy theory.

Any other result would also collapse the doctrinal differences between co-conspirators, on the one hand, and principal/agent relationships, on the other. As the Amended Complaint acknowledges, Ms. Glover spoke at the October 30 Meeting in her capacity as Mr. Pienaar's agent. AC ¶ 15. It is well established that "a principal and its agents constitute a single legal entity that

39

cannot conspire with itself, just as it is impossible for an individual person to conspire with himself or herself." *Usoyan v. Republic of Turkey*, 2025 WL 2642134, at \*14 (D.D.C. Sept. 15, 2025), *R & R adopted*, 2025 WL 3282436 (D.D.C. Oct. 2, 2025).  Upholding a conspiracy theory on these facts would be contrary to that well established principle.  And it would create conspiracy liability any time two people (whether in a principal/agent relationship or not) agree to do *anything*—have lunch, schedule a Zoom, sit on a panel together—if one of them proceeds to commit allegedly tortious conduct during the coordinated, but otherwise lawful, activity that they agreed to do together.  Because there is no allegation that Ms. Glover attended the October 30 Meeting with any knowledge that the statements she and Mr. Pienaar would make were (allegedly) false, there is no allegation that she agreed to do anything improper.  The conspiracy claim must be dismissed.

**V.    Any Claim for Punitive or Presumed Damages Must Be Dismissed.**

Even if Plaintiff were not a limited-purpose public figure, Glueck's claims for punitive and "general" (or "presumed") damages must be dismissed, because the challenged statements involve matters of public concern. In a case involving speech about matters of public concern, "even a private-figure plaintiff was required to show actual malice in order to recover presumed or punitive damages." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774 (1986); *see Gertz v. Robert Welch, Inc*., 418 U.S. 323, 348–50 (1974); *Ayala v. Washington*, 679 A.2d 1057, 1069 (D.C. 1996). Courts routinely dismiss such damages claims at the motion-to-dismiss stage where there are insufficient allegations of malice. *See Mazur v. Szporer*, 2004 WL 1944849, at \*5 n.5 (D.D.C. June 1, 2004) ("Because Mazur has failed to allege any facts supporting his merely conclusory assertion of actual malice, the court concludes that Mazur's claims for punitive damages must be dismissed."); *see also Pearce v. E.F. Hutton Group, Inc*., 664 F. Supp. 1490, 1518 (D.D.C. 1987) (granting summary judgment for defendant on punitive damages claim for insufficient evidence of actual malice and noting "it is not unusual in defamation actions to dismiss claims for punitive

40

damages while retaining compensatory damages claims that are based on negligence") (citing

*Phillips v. Evening Star Newspaper Co*., 424 A.2d 78, 90 (D.C. 1980)).

Glueck's punitive damages claim also fails under D.C. law, which requires that a plaintiff

"prove by clear-and-convincing evidence that the defendant's tortious acts were accompanied by

conduct and a state of mind evincing malice or its equivalent." *Lawrence v. Renaissance Hotel*

*Operating Co., Inc.*, 2025 WL 2709853, at *3 (D.D.C. Sept. 23, 2025) (citation modified). This

"requires proving:  (1) the defendant acted with evil motive, actual malice, deliberate violence or

oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff; and (2) the

defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the

plaintiff." *Id.* (citation modified). The Amended Complaint does not come close on either count.

## VI.    Defendants Are Entitled to Attorney's Fees and Costs.[12]

### A.  The D.C. Anti-SLAPP Act's Fee- Must Apply in Federal Court Because It Operates Independently of the Anti-SLAPP Act's Heightened Procedural Standards.

Defendants are entitled to costs and attorney's fees pursuant to the fee-shifting provision

of the District's Anti-SLAPP Act, D.C. Code § 16-5504.  The Anti-SLAPP Act protects defendants

from meritless "claim[s] . . . aris[ing] from an act in furtherance of the right of advocacy on issues

of public interest."  D.C. Code § 16-5502(b).[13]  D.C. Code § 16-5504 provides that "[t]he court

---

[12] The D.C. Circuit is currently considering the issues presented in this section. *See Akhmetshin v. Browder*, No. 25-7008 (D.C. Cir.) (argued Jan. 26, 2026).

[13] This is indisputably such a claim.  An "[a]ct in furtherance of the right of advocacy on issues of public interest" means any written or oral statement made "(i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or (ii) In a place open to the public or a public forum in connection with an issue of public interest; or . . . Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest."  D.C. Code § 16-5501(1).  The statements made at the October 30 Meeting were, at a minimum, indisputably "expression[s]" that involved "communicating views to members of the public in connection with an issue of public interest."

may award a moving party who prevails, in whole or in part, on a motion brought under § 16-5502 . . . the costs of litigation, including reasonable attorney fees." *Id.* § 16-5504(a). Despite the statute's permissive language such fees are presumptively available to a prevailing defendant at the motion to dismiss stage. *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1238 (D.C. 2016).

As relevant here, D.C. Code § 16-5502 provides that "[a] party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(a). The remaining subsections of § 16-5502 impose procedural rules that apply to such a motion in D.C. courts, namely the burden-shifting and "likely to succeed" standard of § 16-5502(b), and the discovery stay of § 16-5502(c), and § 16-5502(d)'s requirement of an expedited hearing. Because the D.C. Circuit had assumed that § 16-5504 applied only to cases in which § 16-5502(b)–(d)'s heightened procedural requirements also operate, the D.C. Circuit had historically held that *none* of the Anti-SLAPP Act's provisions, including the fee-shifting provision, could apply in federal litigation. *See Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231 (D.C. Cir. 2021); *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015). Indeed, the leading D.C. Circuit opinion on this subject expressly assumed that, *as a matter of District law*, § 16-5504's fee-shifting remedy was available only where a party obtained dismissal under the Act's distinctive state-law procedures. *Abbas*, 783 F.3d at 1337 n.5 (assuming that the Anti-SLAPP Act "does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6)").

But since the D.C. Circuit last confronted the issue, the D.C. Court of Appeals' decision in *Am. Stud. Ass'n v. Bronner* has interpreted the D.C. Anti-SLAPP Act to require dismissal *even where the court applies only the more lenient federal pleading standards*, and thus rendered § 16-5504 independent of the procedural "hurdle[s]" recognized in *Tah*. 259 A.3d 728 (D.C. 2021).

42

Contrary to the *Abbas* footnote, D.C. Code § 16-5504 "make[s] attorney's fees available to parties who obtain dismissal" by means of *federal* pleading standards. Thus, the Act's fee-shifting remedy is no longer tied, as a matter of D.C. law, to the application of procedural rules that the D.C. Circuit has deemed to conflict with the Federal Rules and which therefore cannot apply in federal court. Under this updated understanding of District law, a movant's right to fees under § 16-5504 is tied only to the fact that he has won dismissal of a "claim arising from an act in furtherance of the right of advocacy on issues of public interest" within the meaning of § 16-5502(a).

## B. D.C. Code § 16-5504 Is a Substantive Remedy that Must Apply in Federal Court When a Motion to Dismiss Is Granted Under Ordinary Federal Standards.

The Rules Enabling Act and the Supreme Court's *Erie*/*Hanna* jurisprudence require that § 16-5504's fee-shifting provision apply in federal diversity litigation as substantive District law. As is well established, state fee-shifting statutes are substantive law that, like all state substantive laws, presumptively apply in federal diversity litigation unless affirmatively displaced. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 52 (1991) ("fee-shifting rules . . . embody a [state] substantive policy" when a statute "permits a prevailing party in certain classes of litigation to recover fees"); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975); *see Nepera Chem., Inc. v. Sea-Land Serv., Inc.*, 794 F.2d 688, 695 (D.C. Cir. 1986).

Accordingly, a federal court may decline to apply § 16-5504 only if "a federal rule of civil procedure answers the [same] question" in a conflicting manner. *Tah*, 991 F.3d at 238 (cleaned up); *see Berk v. Choy*, 607 U.S. 187 (2026) (affirming this framework). A federal rule "cover[s] the point in dispute" only where there is a "direct collision" between the federal rule and some state law that is "unavoidable," *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749 (1980) (cleaned up), "thereby leaving no room for the operation of that law." *Burlington N. R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987). Where there *is* "room for operation" of a state law, *id.*, the Federal Rules and

43

state law "can exist side by side, . . . each controlling its own intended sphere of coverage without conflict." *Walker*, 446 U.S. at 752.  Under those principles, if a "federal court can simultaneously apply both the federal standard" for dismissal on a pre-answer motion "and the District rule" for when attorney's fees are available upon dismissal, it must do so. *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1108 (D.C. Cir. 2012).

Here there is no conflict between § 16-5504's fee-shifting mandate and any Federal Rule. No Federal Rule even arguably governs the right of a prevailing party to recover fees, much less a prevailing defendant in a SLAPP suit.[14]  To be sure, as *Tah* explains, certain portions of § 16-5502 still conflict with the Federal Rules and accordingly may not apply in federal diversity litigation. But it does not follow that *all* of § 16-5502's provisions, and its accompanying statutory sections (like § 16-5504), may not apply in federal court.  To the contrary, because a federal court *can* apply § 16-5502(a) and § 16-5504 "alongside" Federal Rule of Civil Procedure 12, it must do so.

## CONCLUSION

For the foregoing reasons, this action should be dismissed without prejudice for lack of subject matter jurisdiction or, in the alternative, with prejudice for failure to state a claim.  In addition, pursuant to D.C. Code § 16-5504, the Court should award Defendants the costs of this litigation, including reasonable attorney's fees and "fees on fees," in an amount to be determined following a motion under Federal Rule of Civil Procedure 54(d)(2).

---

[14] For example, as the Supreme Court has explained, Rule 11 does not speak to the same question asstate-law fee-shifting statutes. "Rule 11 sanctions do not constitute the kind of fee shifting at issue in *Alyeska*. Rule 11 sanctions are not tied to the outcome of litigation . . . . Nor do sanctions shift the entire cost of litigation; they shift only the cost of a discrete event.  Finally, the Rule calls only for 'an appropriate sanction'—attorney's fees are not mandated . . . Rule 11 is not a fee-shifting statute." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 553 (1991).

44

Dated:  May 21, 2026

Respectfully submitted,

/s/ Aaron E. Nathan

Michael J. Gottlieb (D.C. Bar No. 974960)
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com

Aaron E. Nathan (D.C. Bar No. 1047269)
Willkie Farr & Gallagher LLP
787 Seventh Ave
New York, NY 10019
(212) 728-8904
anathan@willkie.com

Joseph L. Meadows (D.C. Bar No. 467441)
Courtney R. Abbott (D.C. Bar No. 488653)
Gloria R. Cannon (D.C. Bar No. 90020115)
Gordon Rees Scully Mansukhani LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Tel:  (202) 399-1099
jmeadows@grsm.com
cabbott@grsm.com
gcannon@grsm.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2026, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's ECF system, on counsel for all parties.


/s/ Aaron E. Nathan

46